1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION


ASA CROSS,

        Plaintiff,

   vs.            CIVIL ACTION
                      FILE NO. 5:17-cv-00446-MTT
SYNTER RESOURCE GROUP,
LLC,

        Defendant.



DEPOSITION OF ASA CROSS


Friday, July 27, 2018
Commencing at 10:53 a.m.
Concluding at 12:28 p.m.


Held at Combs Court Reporting
112 Pierce Avenue
Macon, Georgia  31204




Reported by: Mary Beth Cook, RPR
CCR# 5079-8707-4272-4608




COMBS COURT REPORTING, INC.
112 Pierce Avenue
Macon, Georgia  31204
(478)474-6987

2

APPEARANCES OF COUNSEL:

On Behalf of the Plaintiff:

RONALD DANIELS, Esquire
Daniels Law
723 Bernard Drive
Warner Robins, Georgia   31093
ron@dlawllc.com


On Behalf of the Defendant:

JAMES HAYS, Esquire
Hays, Potter & Martin
3945 Holcomb Bridge Road
Suite 300
Peachtree Corners, Georgia   30092
beau@hpmlawatl.com


Also present:  Brandi Holland, Intern

3

INDEX

ASA CROSS                                          PAGE

Cross-Examination By Mr. Hays                        5

Direct Examination By Mr. Daniels                   65

Recross-Examination By Mr. Hays                     67

4

INDEX OF DEFENDANT'S EXHIBITS

NO.                                                    PAGE

A        Analog Oscilloscopes Exemplar              11

B        Exemplar of DC Power Supply                15

C        AC Mainframe Exemplar                      18

D        Exemplar Elgar 251B                        19

E        Exemplar of HP Frequency Counter           21

F        Exemplar of Pulse/Function                 22
         Generator

G        Synthesizer/Function Generator             24
         Exemplar

H        Exemplar of DC Power Supply                28

J        Exemplar of Two-Channel Synthesizer        29

K        Exemplar of Spectrum Analyzer              31

L        Email Chain                                39

M        5/12/16 FedEx Statement                    51

N        7/23/16 Past Due FedEx Statement           52

P        11/5/16 FedEx Past Due Statement           53

Q        12/10/16 FedEx Past Due Statement          54

R        1/14/17 FedEx Past Due Statement           55

S        Collection Notice                          57

T        12/8/16 Collection Notice                  58

U        1/9/17 Collection Notice                   58

V        12/11/16 Cross Letter to Synter            60

W        Bill of Lading                             68

/ / /

5

(Whereupon, the witness was sworn.)

ASA CROSS,

having been produced and first duly sworn,

testified as follows:


CROSS-EXAMINATION

BY MR. HAYS:

Q    If you could give us your full name.

A    My full name is Asa Guy Cross.

MR. HAYS:  This is the deposition of Asa Cross who is the plaintiff in the case of Cross versus Synter Resource Group, LLC.  It's taken pursuant to agreement of counsel and notice of deposition at this date and time for all purposes available for cross-examination and for use of the deposition.  With counsel for the plaintiff, we have agreed to reserve objections except for the form of the question and responsiveness of the answer until such time as the deposition may be used in the case.

BY MR. HAYS:

Q    Mr. Cross, are you taking any medication or are you presently in any physical state that would prevent you from being able to understand my

questions and articulate answers back to me?

6

A    No, sir, I'm not.

Q    All right.  Can you tell me what you have done to prepare for appearing here at the deposition today?  What did you do to prepare yourself?

A    I talked to Ron and Cliff about what would happen.

Q    You don't have to tell me what you talked -- what was said.  That's privileged information between you and your attorney, but you discussed it with your counsel?

A    Yeah, I discussed it with my counsel.

Q    Did you review any papers, documents or anything?

A    Yes.

Q    How old are you?

A    I am 29.

Q    And where do you live?

A    103 Vassas Court.

Q    And where is that?

A    Warner Robins, Georgia.

Q    And where did you live in May 2016?

A    Might have had down -- I bounced from house to house between my mom's house and sister's house, so it should have been 103 Vassas Court or

306 Emory Drive.

7

Q   You say you bounced between your mom and your sister.  Whose house is Vassas Court?

A   My sister's.

Q   So Emory Drive is your mother's house?

A   Yes, sir.

Q   When you say you bounce in between them, how often do you?

A   Probably about a 70/30 split, 70 percent of the time I spend at Vassas, 30 percent of the time I spend at my mom's house.

Q   Is it a matter of a few weeks at one place and then another week at another?

A   Yes, about that.

Q   So who else lives in your sister's house?

A   Our roommate James and on the weekends another roommate Christy.

Q   And who else lives in your mother's house?

A   Just my mom.

Q   So what do you do for a living?

A   I work at Robins Air Force Base as a electronics mechanic or electrician.  It's a multiskills is what I'm coded for.

Q   You're a civilian employee on the base?

A   Yes, sir, I'm a civilian employee on the

base.

8

Q    And how long have you been working at Robins Air Force Base?

A    I started at Robins Air Force Base September 5th, 2017.

Q    Where did you work before that?

A    Lockheed Martin as a field engineer.

Q    Where were you based?

A    At Robins Air Force Base.  Technically we were based out of Orlando, but I was stationed at Robins Air Force Base.

Q    And what is your basic job duties currently?

A    Currently run wire, do mods on airplanes, populate terminate connectors, do continuity checks, preflight checks on any wire systems we've disturbed or any systems we've disturbed.

Q    Okay.  And when you were with Lockheed, what was your job there?

A    My job at Lockheed as a field engineer was to calibrate and upkeep LM-STAR stations.

Q    What was that?

A    LM-STAR stations.

Q    What is that?

A    It's ATE, automated test equipment.

Q    Did you have any prior jobs for Lockheed

9

while you were there?

A    Yes.  I started at Lockheed August 10th, 2017.

Q    You started at Lockheed August 10th, 2017, and now you're a civilian employee at Robins September 5th?

A    Yes.

Q    So you worked at Lockheed for a month?

A    Two weeks technically.

Q    Where did you work before that?

A    American Corporation or Tyonek Engineering & Agile Manufacturing Corporation.

Q    Agile Manufacturing?

A    Corporation.

Q    Where is that located?  Where were you located?

A    Warner Robins, Georgia.

Q    And when were you there?

A    October 2011 until July 2017.

Q    Where did you work prior to Agile?

A    Lowe's Home Improvement.

Q    At that point you were 21?

A    When I started at Lockheed?

Q    When you started at Lockheed.

17

A    Twenty-two.

10

Q   Where did you go to high school?

A   Warner Robins High School.

Q   When did you graduate?

A   2007.

Q   Did you go to school after that?

A   Middle Georgia Technical College.

Q   Where did you go to Georgia Technical College?

A   Warner Robins, Georgia, or it might be Bonaire or Kathleen.

Q   It's right there in Houston?  It's somewhere in the Warner Robins area?

A   Yeah.

Q   Did you get a degree from Middle Georgia?

A   No, sir.

Q   What kind of classes did you take?

A   Electronics information technologies.

Q   Is that a program that you can get a degree from?

A   Yes, it is now.

Q   When you were doing it in I presume 2008-2009?

A   2007.

Q   Was it a degree program then?

A    It was a certificate program, and then at

11

the end of 2009 or '8 they moved it to associate's.

Q    Did you get the certificate?

A    No, I did not.

Q    So when were you there?

A    End of 2007 is when I started, and I was there on and off until 2009, I believe.

Q    Did you work somewhere before Lowe's?

A    No, I did not.

Q    I want to talk about the equipment shipment from May 2016.

(Defendant's Exhibit No. A marked for identification.)

BY MR. HAYS:

Q    In response to a question that I asked in connection with the lawsuit, what we call interrogatories which were a series of questions we asked.  I assume your attorneys discussed them with you.  One of the questions was what did you deliver to ANA Instruments.  One of the items you listed on there was called a 2465CTS.  That's an analog oscilloscope, right?

A    I believe so.

Q    I want to show you what I marked as Exhibit A and ask you is that a representative

21

picture and description of the 2465?

12

A    I honestly don't know because I don't remember what it looks like off top of my head.

Q    Do you remember that one of the items that you were selling was an oscilloscope like that?

A    I do believe so.

Q    Do you know what one of those is used for?

A    It's used to track the waves -- electrical impulses through electronics equipment or through electronic components.

Q    So where did you get the one that you were selling?

A    I pulled it out of the trash.

Q    And where was the trash?

A    Dumpster at my old job at Tyonek.

Q    Where was it again?

A    In the Dumpster or in an old station that we threw away at my old job at Tyonek.

Q    Did you work with those when you had that job?

A    Not with this specific one, no.

Q    So it's your understanding that they had -- and I am not hearing you correctly.  The part that I got was Agile, but the name you keep calling this company is?

A    Tyonek, T-Y-O-N-E-K.  It has about seven

13

different names.

Q    And that's what you referred to it as when you were working there?

A    Yes.

Q    So Tyonek had some old equipment --

A    No, it didn't belong to Tyonek.  It belonged to Lockheed Martin.

Q    So Lockheed Martin.  So it's your understanding this equipment had belonged to Lockheed?

A    Yeah.  Lockheed Martin owned it originally.

Q    And how did you find out it was in the Dumpster?

A    I put it in the Dumpster.  I was told to put it in the Dumpster by my supervisors.

Q    And that was while you were at Tyonek?

A    Yes.

Q    They said take this, this is trash?

A    Throw it away.

Q    Was it being replaced with newer equipment or the job had finished?

A    No.  It was just cheaper for Lockheed Martin to have us throw it away.

Q    Do you remember when that was?

14

A    Beginning of 2016.

Q    So did you ever use it?

A    Yes.

Q    What did you use it for?

A    Just to fiddle around with stuff at the house.

Q    Like what?

A    Fans, stuff like that, like trying to build little race cars out of random parts.

Q    Where did you keep it?

A    In my garage.

Q    And that's on Vassas?

A    Vassas.

Q    So when did you decide to sell it?

A    I didn't sell everything.  I still have stuff.  The only thing I sold was all the extra stuff that I didn't need or use.

Q    When you say that stuff you didn't need, what are you using it for, the stuff that you did need?

A    Just to check sine waves, stuff like that, make sure components were good.  There are power supplies that would kill me if I didn't wire them up right, so I don't need stuff like that.

Q   So when was it you decided to sell some

15

stuff?

A    February or March I think.

(Defendant's Exhibit No. B marked for identification.)

BY MR. HAYS:

Q    Let me show you what I marked as Exhibit B.  It represents one of the other items that you sold on there was a 6033A.  Is Exhibit B a representative picture of what that 6033A you sold was?

A    I believe so, best of my knowledge.

Q    And so that's a DC power supply.

A    DC power supply it stands for direct current power supply.

Q    What's it used for?

A    It's mainly used to send a signal through an otoscope and make sure that it keeps constant signal or to input a signal, know what you're putting in if it's calibrated so you can tell if the component is off or not.

Q    So what this does is it provides a consistent power supply so that you can rule out power spikes when you're trying to test a piece of equipment?

A    One of the things it does, yes.

16

Q    And where did you get that?

A    Same place I got the otoscope.

Q    So early 2016?

A    Yes.

Q    It belonged to Lockheed Martin.  They instructed you to toss it away?

A    They instructed Tyonek to throw it away.

Q    And did you actually throw away and then take it back out, or did you --

MR. DANIELS:  Object to the form.

BY MR. HAYS:

Q    Did you actually throw away the equipment? You referenced -- you said earlier that you came from a Dumpster.  Did you put it in the Dumpster before removing it from the Dumpster?

A    No.

Q    So I don't want to -- feel free to disagree with the characterization.  They told you it's trash, throw it away, and you thought I might be able to make some use of this and decided to keep it; is that accurate?

A    No.

Q    Okay, then characterize how it went. Which part of that did I get wrong?

A    My supervisor instructed or Lockheed

17

instructed us to throw it away because it was cheaper for us to throw it away than to ship it back to them for them to dispose of it.  We brought it out to throw it in the Dumpster.  I saw it had parts, and I asked if I could have them.  I was told as soon as it leaves these doors to go in the Dumpster I could have whatever I want.

Q    Okay, fair enough.  So did you make any use of the power supplies?

A    No, not those ones.

Q    And why is that?

A    Because they could kill me if I'm not careful.

Q    So what is it about that that could kill you if you weren't careful?

A    It's 30 amps.  Amperage resistant.  It takes .1 amps to cross the heart to kill somebody.

Q    So did you feel that you weren't technically qualified to use it safely?

A    No.

Q    Are you disagreeing with my question or are you agreeing with it because I asked that with a negative in the middle of it.  You said you didn't want to use it because it might kill you.  What was

it about using it that?

18

A    It's just one of those things it's not worth the risk if I'm not careful.

Q    And so where did you keep that?

A    In my garage.

Q    Decided to sell it around the same time?

A    Yes.

(Defendant's Exhibit No. C marked for identification.)

BY MR. HAYS:

Q    The next piece of tech that was identified in the interrogatories it says Edgar, but I believe it's an Elgar 503?

A    Yes.

Q    And let me show you Exhibit C and ask you if that's a representative picture and description of the piece of equipment you're talking about?

A    Yes.

Q    This is an AC power source mainframe. What's the difference between this and the DC power source we were talking about before?

A    DC power source is basically what you run -- you plug something in the wall and run it off of.  No, DC power source is run off batteries.  AC power source is run off of alternating current, so

it runs through power lines and things like that.

19

Q    So what's different about the piece of equipment then for using in electrical testing?

A    Certain pieces of equipment they run on different types of current, so a piece of equipment that you take out to the field is going to be run off of direct current.  A piece of equipment that's in a warehouse somewhere is going to be alternating current.  It's just depending on how they're going to be used and where they're going to be used depends on what type of current you run through it.

Q    So did you ever use this 503?

A    No, I didn't use that.

Q    Was that for the same reason?  I don't see any amperage located on the description anywhere so I didn't know.  Why wasn't it used?

A    Honestly I'd blow anything up that I had to use it on.

Q    And where did you keep it?

A    In the garage.

Q    And decided to sell it around the same time?

A    Yes.

    (Defendant's Exhibit No. D marked for
    identification.)

37

/  /  /

20

BY MR. HAYS:

Q    Now, also with the -- at the time you were corresponding with ANA Instruments about shipping this stuff, you made reference to the 251 -- there's a reference in emails to 251B Elgar.  And show you Exhibit D and ask you if that's a representative picture and description of a Elgar 251B.  Does it look like that?

A    Yes, it is.

Q    And is there a distinction between that and the 503?

A    Yeah.  One's three phase and one's a single phase.

Q    What's the difference between three phase and single phase?

A    Three phases pretty much you can almost run on -- it's like running three different things at one time.  Single phase is just running one signal through it.

Q    So the three phase --

A    Can run three signals at a time.

Q    Tests more equipment, can run more tests?

A    It tests differently.  There's certain components that can run different signals through

39

it. That can run more signals than a single phase

21

can.

Q    So what kind of component would you need the three phase for?

A    You could use it on an iridium processor. I don't know how to spell that. You can use it for an otoscope. You can use it to run otoscope and a digital multimeter. I can't remember all off the top of my head right now.

Q    So when I asked you if you had used it and you'd said no, part of the reasons you didn't have anything that it was particularly useful for?

A    Yeah, I didn't have a particular use for it.

Q    So you didn't end up not selling those to ANA. Do you still have them?

A    Yes, I should.

Q    Where do you keep them?

A    In the garage.

(Defendant's Exhibit No. E marked for identification.)

BY MR. HAYS:

Q    Next thing that you'd identified was a 5334A HP. Is that frequency counter that I'm handing you as Exhibit E, is that that piece of

equipment?

22

A     To the best of my knowledge it is.

Q     So what is a frequency counter?

A     It counts out how often a wave comes through.

Q     What's it used for?

A     To count how often a wave comes through. It's how fast those waves are coming in, so the faster the wave comes in, the higher the frequency. Pretty much just used to check those and to see how fast the signal is running through it.

Q     So did you ever make any use of the frequency counter?

A     No, I didn't have any use for that.

Q     When you took it -- and I don't imply -- by took it, I mean removed it from where it was at the place to your garage where you stored all these things.  When you did that, did you have an idea of what it might be used for, useful for you for?

A     No.

(Defendant's Exhibit No. F marked for identification.)

BY MR. HAYS:

Q     The next piece of equipment that was referenced in the interrogatories was an HP 8116A.

43

And is that Exhibit F is that the equipment that you

23

had that you're referring to?

A    I believe so.

Q    And that's a pulse/function generator?

A    Mm-hmm.

Q    So what's a pulse/function generator?

A    It's a way to send a signal.  You send a signal through a function generator that's set up to send a certain series of signals through.

Q    And when you're sending these signals from where to where?  What's the equipment on either end that you're sending the signal to and from?

A    Whatever equipment you want to hook up. It's not sending a signal from where to where.  It's where you're sending the signal through.

Q    So this is sending a signal through a piece of equipment?

A    A piece of equipment, a component, whatever you want to hook up in between that's electrically able to hook up.

Q    So what kind of components would that be?

A    Capacitors, resistors, any type of circuit board you want to build.  You can send it through an otoscope if you want to.

Q    Just to clarify, you've used the term a

few times.  An otoscope is an oscilloscope?

24

A    Yes.

Q    So did you ever make any use of the 8116?

A    No, not really.

Q    Is it correct to say that this, like the others, was kept in the garage?

A    Yes.

Q    And included when you decided to sell it all around the same time?

A    Yes.

(Defendant's Exhibit No. G marked for identification.)

BY MR. HAYS:

Q    You had also identified HP 3325A which is Exhibit G, and ask you if that's a representative picture of the piece of equipment you had and sold to ANA, a synthesizer/function generator?

A    Yeah, that is.

Q    You were peering at it.  Did the picture not resemble or you had to read the description? What was it that spurred your recollection?

A    The stuff in back looks like it's on top of it, and all that stuff is supposed to be rack mounted so there should be nothing on top of it.

Q    So when you say rack mounted, what does

rack mounted mean?

25

A    It's mounted inside a rack inside of a station.

Q    So this would be one piece of a number that you'd place in a rack?  Is that usually different pieces of test equipment so that you can use whichever one you need easily?

A    Yes and no.  You'll have certain types like the, you know, power supplies you'll have multiple power supplies of the same type, different phases depending on what you're trying to do.  If you're trying to calibrate something, you normally want more than one type of power supply in there, and you also want more than one of that power supply.  That way you can calibrate them in sequence.  If you're running a test on a piece of equipment, you're going to want to use different types of power supplies depending on what that equipment is supposed to do.

Q    And so what does this kind of synthesizer/function generator testing?

A    Sends a signal.  All this stuff does is send a signal.

Q    So you had two of these?

A    Mm-hmm.

Q    I assume both of them were part of the

26

Lockheed Martin trash?

A    Yes, they were.

Q    Did you make any use of the 3325s?

A    No.

Q    When you picked them up, were they part of a rack?

A    Yeah.  They were in a station.

Q    What else was in the station?

A    Everything.  All the stuff that was sold was in the station.

Q    So while these are these discrete components, it was all actually in one -- these components were all racked into one station?

A    Three different ones.

Q    Three different stations?

A    Yes.

Q    So some were mixed and matched across these components?

A    Yes.

Q    So these were each pretty heavy, weren't they?

A    Extremely heavy.

Q    How did you get them from there to the garage?

A     In a wheelbarrow.

27

Q    Was there a truck involved at some point?

A    Moving them to the back of my truck.

Q    So you had a trucks?

A    Yes.

Q    From Tyonek you put them in the back of the truck and wheeled them from the back of the truck to the garage?

A    Yes.

Q    As still stations?

A    No.

Q    When did you disassemble them?

A    Before we threw the carcasses of the stations into the trash.

Q    When you say carcasses of the stations, I assume you mean the metal rack?

A    Yeah.

Q    The metal frame?

A    Yeah, what everything slides into it.

Q    Bunch of L joints and lots of screw holes?

A    No, they were enclosed stations.  It was a box that had racks in the front, and it was open in the back, and then everything was mounted to the front.

Q    So there was much more metal in the

station racks?

28

A    Yes.

Q    They would be ridiculously heavy?

A    Empty they'd be light, but full they'd be superheavy.

Q    So if I asked this, I apologize.  I got off track when we were talking about the stations. Did you have any reason or make use of the 3325s?

A    Not at the moment I grabbed it.

Q    Did you use it after that?

A    No.

(Defendant's Exhibit No. H marked for identification.)

BY MR. HAYS:

Q    We talked earlier about the 6033A power supply.  You also mentioned that you had three 6038 power supplies.  Is Exhibit H there is that a fair representation of what those power supplies were?

A    Yes, it is.

Q    And those are 60 volt, 10 amps, so they're a slightly high amperage.  What's the use difference for them in most applications?

A    It would be to power other components on the station or to power a component for something or to send a signal through.

Q    So did you make use of these power

29

supplies?

A    No.  That's the same one you asked me before, isn't it?

Q    No, this is the 6038.  Previous was the 6033.

A    20-volt 30-amp?

Q    Yeah, just to clarify, that was the 20-volt 30-amp.  This is the 60-volt 10-amp.

What's the difference in electronic testing between that kind of voltage and amperage?  What's the difference in the kind of equipment you're going to be testing with that?

A    So voltage is how high the peak's going.  Amperage is the nonresistance between two points.  So a light bulb is bright because there's resistance from one lead to another, heats up, gets red hot and creates light.  That's all resistance is, so you use it to slow stuff down, use it for timing purposes, stuff like that.

(Defendant's Exhibit No. J marked for identification.)

MR. HAYS:  I'm going to skip Exhibit I because it looks a lot like a one, and it gets confusing.

57

/ / /

30

BY MR. HAYS:

Q    The next item on the list of equipment was a 3326A two-channel synthesizer.  Is that a representative picture and description of what that piece of product was?

A    Yes, it should be.

Q    Several of them say HP Agilent.  Do you know what Hewlett Packard --

A    Hewlett Packard/Agilent they're the same company.

Q    Was there a difference -- so it's the same company?

A    It's the same company.

Q    So what is this kind of --

A    It's just used to send a signal through.

Q    This is two-phase modulation.

A    Modulation is control like your voltage and frequency, how fast it's going to go.  Just changing your input.

Q    So that allows you to change -- you could change both the voltage and the frequency at the same time to test when you send the signal through?

A    Yeah.

Q    Did you ever make any use of the

synthesizer?

31

A    No.

Q    What kind of condition was this equipment in?

A    Old, it was very old, hadn't been used in years.

Q    So it had just been laying around at the Lockheed Martin facility?

A    Yes.

Q    Nobody was using it to test anything?

A    No.

Q    Word came down that it's time to get rid of it, and Lockheed Martin said don't ship it back here, just throw it away?

A    They technically ship it to us to throw away.  This stuff hadn't been used in 15 or 20 years, to my knowledge.

Q    And you had two of the two-channel synthesizers?

A    Yes, to my knowledge.

        (Defendant's Exhibit No. K marked for identification.)

BY MR. HAYS:

Q    In the responses you also listed an item sent to ANA Instruments, an HP 8526A.  It does not

appear to be one of the things that was on the list

32

of purchased items.  So first let me just show you Exhibit K and ask you if that is a representative picture and description of the 8562A that you have -- had or have?

A    It should be, yes.

Q    So that's a spectrum analyzer.  What's a spectrum analyzer?

A    It should just -- it's pretty much an upgraded oscilloscope.

Q    So it's essentially a fancy oscilloscope?

A    Yeah.  It has a few more options of stuff to do, but it checks different things other than -- otoscope is going to check your frequency, check your amperage, your voltage, all that.  This will check different types of things like, you know, this is microwave analyzer, stuff like that or spectrum analyzers.  They check different things or different wave forms than just a regular otoscope.

Q    So was this newer looking than the other pieces that you had that were there, or did it also look like it was ancient?

A    All were ancient.  Had an inch of dust on all of it.

Q    All right.  So while -- as I said, your

interrogatory responses said this was one of the

33

pieces that you sold to ANA, but it wasn't on the list from the emails that Al Landino gave you prices for.

A    No, it was not.

Q    So did you sell this?

A    Yes, I did.

Q    Who did you sell it to?

A    ANA.

Q    When?

A    It would be February or March, somewhere in there.  Whenever everything else got sold to ANA. I believe I sold that to them.  I'd have to go back and look through my emails.

Q    Okay.  We will talk about that in a few minutes.  But you sold it in a different shipment, a different transaction?

A    It was a different transaction, yes.

Q    Was it before?

A    Before.

Q    Did you sell anything else in that first?

A    No, I did not.  There was a series of transactions leading up to the main transaction.

Q    Well, let's discuss.  So I was going to ask, so you got the stuff in January 2016, you said,

early 2016?

34

A    Early.

Q    And you had said that it was February or March when you started trying to sell them.

A    Yeah.

Q    So how long between when you said see what I can do to sell this and the first time you had a transaction with ANA?

A    I honestly do not know.

Q    Let me ask you something different.  How did you market it?  What did you do to sell it?

A    I just put it on eBay.

Q    Have you put other things on eBay?

A    I had at that time, yeah.

Q    What else?

A    I can't remember off the top of my head. I know that he bought two or three things from me on eBay before we talked about everything else I had.

Q    But before we talk about that, have you sold anything besides electronics equipment on eBay? Have you used eBay to sell anything else?

A    No.

Q    So there was -- you advertised on eBay, so ANA reached out to you as the seller, expressed interest in buying it?

A     This specific item?

35

Q    Just generally.  Let's go back to when you put it up.  You advertise it on eBay, and I will confess I don't know how to do it, but my guess is you post pictures and/or descriptions of some equipment and say for sale in whatever category they put it in.

A    Yeah.

Q    And so somebody, in this case ANA Instruments read that and contacted you; is that right?

A    They just bought it.  The way you set up on eBay is you set it up for a set price that you want to sell it for or you can do make an offer, so he made an offer for this.  I responded with another offer.  He agreed to it and bought it.

Q    And it was just the frequency analyzer?

A    I was only selling it as single parts at a time.

Q    Was that the only thing -- was it all advertised at the same time?

A    No, it was not.

Q    So the first advertisement, the first thing you put on there, was that the frequency analyzer?

A    No, it was not.

36

Q    What was it?

A    I don't remember.

Q    Was it any of the ones we're talking about here that you later sold to them, or was it something else?

A    It might have been one other thing that had been sold to them.

Q    So initially you put up a couple of pieces, said buy these, and who bought those?

A    ANA bought two or three things, and somebody else -- two other people bought two other things.

Q    So ANA bought two or three items?

A    Mm-hmm.

Q    And then somebody else, and you don't remember who it was?

A    I don't remember who they are.

Q    No reason why you necessarily would?

A    No.

Q    So that was the first time you posted four or five things apparently and you sold?

A    Three things.

Q    Well, you sold --

A    First posting was three different things.

71

Q    Three different things.  Do you remember

37

which ones, even just roughly, frequency analyzer versus power supplies?

A    It was spectrum analyzer, I remember posting that, and it might have been an otoscope.

Q    And ANA bought a couple of them, and somebody else bought one or two other bids?

A    Yes.

Q    That was the first time, and that was in February, March?

A    Somewhere around there, yes.

Q    The exact time isn't terribly important. I'm just trying to get the feel for it. So you did that. Do you remember what the price was?

A    No, I don't.

Q    How did you get paid?

A    PayPal.

Q    Come back to that in a little while. Same thing for the other buyer?

A    Yes, PayPal. Everything went through PayPal.

Q    So that was the first offering, sale. Then how long before you did another?

A    When I saw that ANA bought like three things, two things in a couple hours, I reached out

to them and told them that I had all this stuff I

38

didn't need anymore, and I had no use of it.  If he was interested to make me an offer.

Q    Okay.  And that resulted in this sale, or was there another in between there?

A    No, that's what resulted in this sale.

Q    Did you sell anything to anybody else other than that one?

A    I think I sold one power supply after that that was still posted up on eBay that he didn't want.  I couldn't tell you which one it was.

Q    I know you sold the Elgar 503.  You had three 251s.  Was it one of those?

A    I think it was a 251 because it's heavy.

Q    So what do you have left, to your knowledge, to your recollection?

A    There's an otoscope, a couple power supplies, a couple digital multimeters, maybe some function generators.  I'd have to look at all of it.

Q    Have you been trying to -- have you posted those up for sale?

A    No.

Q    So you haven't done it again after this?

A    No.

Q    Dealing specifically with talking about

ANA Instruments at this point, in response to our

39

request your attorneys produced a handful of email chains, correspondence.  Each of which -- I'll make it a group Exhibit L.

(Defendant's Exhibit No. L marked for identification.)

MR. HAYS:  For counsel and for the record, I'll represent these were the documents that were produced by counsel Bate stamped pages 59 through 70 which were originally from bad copies.  When I got them I recopied them onto the same page because they're easier for everybody to work with.

BY MR. HAYS:

Q    Each of them starts with the heading "from Asa Cross" and your email, Subject:  ANA Instruments, April of this year, to Cliff Carlson at a ridiculously early time in the morning.  And so there are, by using that as the divider there, appears to be four different email threads here. There's a lot of overlap on them.  But each of them starts with an email from Al Landino time-stamped May 3rd, 2016, 10:01 a.m.  It's on page 2 of the document we're looking at at the bottom.

It says:  "Asa, Thanks.  Send me over the

list.  I appreciate it."  This, I assume, was in

40

followup you were telling me that they reached out to you again -- I'm sorry, you reached out to him and said I saw you bought this, I've got a bunch of stuff?

A    Yes.

Q    Was there a prior email, or was there a phone call?

A    There was a message on eBay.

Q    So there's a message feature?

A    Yeah.  So I messaged him on eBay, and he said here's my email, send me the list.

Q    And so he emailed you to send over the list.  I appreciate his cell phone number.  The next couple minutes later you reply.  "This is Asa. Here's the list of everything excluding what you already purchased," and then a symbol which I believe there was an attachment.

A    Yeah.

Q    What was the attachment?  By which I mean what kind of computer file?  Was it a Word doc, a pdf?

A    It was just off my phone.

Q    But the list?

A    It should have been an Excel spreadsheet.

Q    And what was on the spreadsheet?

41

A    Just a list of everything I had.

Q    So item like the descriptions we were talking about?

A    No, there were no descriptions.  It was just the name of whatever I had, so Spectrum or HP 8560.  That was it.

Q    So it just said HP 8560?  Didn't say Spectrum analyzer or you didn't need to say that?

A    I didn't need to say that.

Q    Because the buyer knows exactly what this stuff is?

A    Right.

Q    So that was -- you're describing it here: "Here's the list of everything.  Just exclude what you've already purchased."

Had you taken from the list of everything taken off the two or three things that you had sold to the other person at that point?

A    I believe so.  Yes, I believe so.  I had already removed.

Q    So you had taken a couple of things off of the list?

A    Yeah.

Q    Just exclude what you've already

purchased.  You didn't take the stuff off that he

42

bought because he knew he had already bought it?

A    Yeah.

Q    What's the time gap between when he, you know, bought the first stuff and this conversation which is on May 3rd?

A    Maybe two hours.

Q    So had you even -- so the first purchase with ANA, those pieces, you still had them at this point?

A    Yes, I still had them.

Q    Skip down to what is marked at the bottom there.  On the page stamp it says page 66.  This is another of the email threads.

A    Mm-hmm.

Q    And down toward the bottom of the page: From Asa Cross to Alfred Landino.  We're on now May 6.  "Hey Al, I got everything packed and weighed.  The total comes to 600 pounds."  How did you package it up?

A    I don't have that page in here.

Q    Let me have Exhibit L back if it's not a complete copy of what we're looking at.

        MR. HAYS:  Let the record reflect that
    Mr. Daniels has allowed us to supplement with

83

page 66.

43

BY MR. HAYS:

Q    So you're following along with me on page 66 down toward the bottom where you say I got everything packed and weighed, total comes to 600 pounds.  Right at the very bottom:  "Okay, thanks.  Al.  Sent from my iPhone from Asa Cross."

I want you to read it to make sure I'm not incorrectly reading it.  How did you package it?

A    In a tri-wall on a pallet.  It's a type of packing box.

Q    Where do you get those?

A    I got one from work.

Q    So a pallet like one of those wooden pallets?

A    Yeah.

Q    So you got that and the box from work?

A    Yes.

Q    It's about four foot square?

A    Roughly, yes.

Q    And piled it all in there, and then you weighed it.  How did you weigh it?

A    On a pallet track that has a scale on it.

Q    Was that a work too?

A    Yes.

Q    So did you wheelbarrow it all back to

44

work?

A    Yeah, pretty much.

Q    And take it out of the truck.  Reverse what you did a couple months before?

A    Yes.

Q    Took it all back to work, got a pallet, got a tri-wall box and packed it all in there, pumped up the pallet jack, pallet jack says 600 pounds, then used the pallet jack to put it back in the truck?

A    No, used a forklift because it was 600 pounds.

Q    Just so that I have the geography, where is that office?

A    Off of Green Street and 247.

Q    That's in Warner Robins, right?

A    Yes.

Q    How far is that from the house on Vassa?

A    Fifteen minutes, if that.

Q    So forklift into the back of your truck. Truck wheels are scraping the back bumper at this point?

A    Not yet.

Q    And so you'd said I can drop it off at

FedEx Freight today.  It's only like 20 minutes.

45

Had they provided you with that bill of lading at that point?

A    Yes, they had.

Q    And so did ANA recommend FedEx Freight, or did you find them?

A    ANA did.  ANA told me that when we talked on the phone that they would pay for shipping.  They would provide the bill of lading, and that because they use FedEx, FedEx is who they were going to use, they'd send the bill of lading with their account number already on it, and all I had to do was go drop it off and hand them the bill of lading.

Q    So did you contact FedEx Freight before you took it over there?

A    Yes, I did.

Q    So they knew you were coming?

A    I asked them what I needed to do, and they said just drive up here and drop it off whenever you want.

Q    For the picture of it, the FedEx Freight depot, which is a few blocks from here, it's a loading dock depot.  It's not one of these storefronts like a FedEx Kinko's?

A    Yes, correct.

89

Q   Loading dock, rollup doors?

46

A    Yes.

Q    So you brought the truck around back in there.  Did they help you forklift it off the truck to where they were going to use it?

A    They took it off the truck themselves.

Q    So you got there, said here it is, handed them the bill of lading?

A    Yes.  Asked if it was correct, and I said, Is this correct, I'm not paying for this.  I said, The people who are receiving it are paying for it.  They said yes, that is correct.  I said, Do I need to sign anything?  They said no.

Q    When did you get paid by ANA Instruments?

A    Payment I believe he did half up front -- the stuff bought from eBay was immediate, and the other stuff was immediate as soon as I -- as soon as we agreed on the price, he sent me the money for it, but PayPal puts a hold on it until they got it.  And once they got it, PayPal cleared it, and then took another week for it to clear again through PayPal before I was able to do anything.

Q    Did you send the frequency analyzer?

A    Yes, I did.

Q    So that was in part of that shipment even

though it wasn't part of what he bought that time

47

that's why it was listed as part of what you sent to him?

A    Yes.  He told me that to ship everything together it would be easier and to just return the shipping fee that he had paid on eBay, which is actually right there.

Q    There's an email that says something about refund.

A    Correct.

Q    Yeah, it says "Also need a refund on the shipping I already paid for if you could."  That was talking about there's an -- eBay included a slipping charge?

A    If you tell eBay the size of the package and how much the package is going to weigh, they automatically include a slipping fee into it. That's included when you buy it.

Q    So eBay wanted to include as part of the purchase price the money you were paying for the different pieces and then a shipping charge?

A    Yes.  I can do it that way, or I can do it myself for the shipping charge and just put a random shipping charge on there.  But eBay will have UPS or FedEx.  It'll have which type of carrier you want to

use, if you want to overnight, all that, you just

48

put in the dimensions of the product, they tell you how much it's going to cost for whatever type you choose, and that's included in the price whenever you buy it, if you choose to do that.

Q   And so the eBay sale was only a handful of these little things, so the shipping that was included in that wasn't remotely close to the total shipping cost; is that fair?

A   It was about $100 altogether in shipping costs roughly.

Q   On eBay?

A   Yeah.

Q   Did you process a refund?

A   Yes, I did.

Q   So you mentioned -- how much did you finally end up getting from ANA Instruments?

A   I don't know honestly.  $2,000 or somewhere around there.  I don't know the specific number.

Q   If we added up the prices that were quoted by Al on May 3rd, 2016 -- they're all on one page on page 62.  And we don't have to do the math now, but those were the prices except you then went $70 instead of $60 for the 5334As and asked for

$50 instead of $40 on the 8116, the two of those.

49

So the price for that shipment when you add that number up is that accurate?

A    No, because the Spectrum analyzer was a very expensive piece of equipment.

Q    That's kind of what I was saying.  That was the price for that stuff and then the Spectrum analyzer?

A    Yeah, it was the price for everything that I sold him altogether.

Q    But the payments came separately?

A    Yes.

Q    Spectrum analyzer that payment came through?

A    EBay.

Q    And so do you remember roughly how much that was?

A    No, I don't.  I want to say 6- or $700, but I couldn't tell you exactly what it was.

Q    So the Spectrum analyzer sale that was 6- or $700 got processed through eBay directly?

A    Yes.

Q    Did eBay pay into your PayPal account?

A    Ebay doesn't pay into my PayPal account.  It's paid by PayPal.  EBay is just the middle person

for selling the product.

50

Q     But I mean the money for the eBay payment you said happened immediately.  That went to PayPal?

A     Yeah, that went to PayPal.

Q     But there wasn't a hold; that was the distinction?

A     No, there was a hold.

Q     Oh, there was a hold on that well?

A     Yes.

Q     So 6- or $700 for the Spectrum analyzer. Total you said was about $2,000?

A     Yes.

Q     So when did you set up a PayPal account?

A     March or April.  It's not the first PayPal -- well, I set one up in 2006.  I just had to reactivate it, and that was just so I could buy stuff off of eBay back in 2006.

Q     So does PayPal give you an account number?

A     I think they do have an account number. Everybody has their own account number, but yeah.

Q     But you don't need to know a PayPal account number.  You just log in, user name, password?

A     Yeah.

Q     And that goes to your account.  The

account number is for them, not you; is that

51

accurate.

A     Pretty much, yes.  Unless you had more than one PayPal account.  Then I guess you had to pay attention to it.

Q     So the PayPal money gets paid through eBay and went directly to PayPal.  Then PayPal turns around and pays you?

A     Yes.

Q     ACH to a bank?

A     Yeah.  It went to my bank account.

Q     What bank is that?

A     USAA.

Q     Did FedEx Freight invoice you for the charges?

A     Yes, like three months later, two or three months later, I believe.

        (Defendant's Exhibit No. M marked for
        identification.)

BY MR. HAYS:

Q     Let me show you what I marked as Defendant's Exhibit M and ask you if you recognize that.

A     This is the statements that they sent me. They're all the same, just the dates are different.

Q   Well, the statement date on that one is

52

5/12/2016 references the freight bill on 5/6.  You'd said that they didn't bill you for two or three months.  Do you recall getting that statement?

A    No, I don't.

(Defendant's Exhibit No. N marked for identification.)

BY MR. HAYS:

Q    The next document is marked as Defendant's Exhibit N, and spend however much time you want to spend looking at it.  That's another FedEx statement and backup.  That one is dated 7/23.  Was that about the time you heard from them?

A    Yeah.

Q    So that's a couple months later.  What did you do in response to that?

A    I called FedEx to ask them what was going on and how I owed them anything.

Q    And what did they tell you?

A    They said that because a specific box was not checked off on the bill of lading that it was my fault, and I needed to call them and talk to Al.

Q    Did you do that?

A    I tried to.  He never got in contact with me.

/    /    /

53

(Defendant's Exhibit No. P marked for identification.)

BY MR. HAYS:

Q   Skip letter O for the same reason we skipped I and move on to P.  Show you Exhibit No. P, see if you recognize that.  The statement date on that was November the 5th.  Do you remember getting this statement around November 5?

A   I do.

Q   Did you do anything at that point?

A   I talked to my lawyers.

Q   So in November when this came in, around this time, you contacted an attorney?

A   Well, we had already been attorney-client.

Q   Well, let me back up and without getting into the details of the relationship, was it Mr. Daniels?

A   Mr. Daniels and Mr. Cliff.

Q   So when did you first contact them about the FedEx issue?

A   I believe -- I couldn't tell you 100 percent the exact date, but it was either the first one or the second one that I got.  I don't remember.

Q    So either -- well, we have the one in

54

July, previous exhibit, and this one in November.
One or the other of those you contacted?

A    Somewhere along there, yeah.

Q    Did you make any effort to contact FedEx again?

A    No, I didn't.

Q    Do you know whether your attorneys made an attempt to contact FedEx?

A    No, I don't.

        (Defendant's Exhibit No. Q marked for identification.)

BY MR. HAYS:

Q    Let me show you what's been marked as Exhibit Q, ask if you recognize that?

A    Honestly they all look the same to me.

Q    That one has a statement date of December. Do you recall getting one in December?

A    I may have.  I don't know.  I don't know exactly the date I got them.

Q    Did you do anything in response to getting the statement after the one time you made those calls?

A    I passed it on to my attorneys.

Q    So if that one came in in December, did

you contact your attorneys again and say here's

55

another one?

A    Yes.

Q    Okay, fair enough.

(Defendant's Exhibit No. R marked for identification.)

BY MR. HAYS:

Q    Exhibit R is a statement dated January 2017.  Do you remember getting that one?

A    I honestly cannot say.

Q    If you did get it, did you pass that on to your attorneys?

A    Yes.  I saved them all in a box, and whenever we'd meet up I'd hand them to them.

Q    Did you keep a copy yourself?

A    No, I did not.

Q    When did you first here from Synter Resource Group?

A    I could not tell you.

Q    Do you recall how you first heard from Synter Resource Group?

A    I do not remember.

Q    The Complaint which was filed in your name, Asa Cross versus Synter Group, the reason we're here, has a statement that states:  On

December 5, 2016, defendant placed a phone call to

56

plaintiff's cellular phone.

Do you recall that being the date?

A    I don't recall that being the day.  I don't know contactually what day it was off the top of my head.

Q    And it states that they left a voice mail on your phone; is that correct?

A    That is a possibility.  I don't know if that's the exact date or not.  I'd have to go through my phone and look at it.

Q    So when the information that was provided to your attorneys for the suit, how did you provide -- what did you give them as the information?

A    I gave them the voice mail.

Q    The voice mail has time stamps on them?

A    Time stamps, yes.

Q    But you testified a minute ago you don't know -- you don't remember if that was the first time you had heard from Synter or not?

A    I do not remember off the top of my head, no.  It was almost two years ago.

Q    When you heard from Synter, when you got this phone message, do you remember what the message

said?

57

A    No, I don't.

Q    Well, what did you do when the call came in when you heard the voice mail?

A    I let my attorneys know.

Q    That day or was it a week later?

A    I believe it was that day.

Q    What else did you do?

A    Talked to my lawyers about it, waited for what they suggested I should do.

Q    And without telling me what they suggested you should do, what did you do?

A    Waited.

Q    What happened while -- after you waited?

A    I believe I had a few more phone calls and a couple letters from them too.

(Defendant's Exhibit No. S marked for identification.)

BY MR. HAYS:

Q    Show you what I marked as Exhibit S and ask if you recognize that.

A    Yes, it looks familiar.

Q    That's a letter from Synter Resource Group with a date of November 8th.  Do you recall getting a letter from them around that time?

A    I do not remember the exact time frame I

58

got the letter.

Q    You did say a minute ago that you got a couple of letters from them over time, correct?

A    Yes.

(Defendant's Exhibit No. T marked for identification.)

BY MR. HAYS:

Q    Show you Exhibit T and ask you if you recognize that.

A    It looks like the collection letter, the same thing.

Q    That one's dated the 8th of December. Do you remember getting that one?

A    I remember getting a collection letter.

Q    And what did you do with it?

A    Put it in the box to give to my attorneys.

Q    How often did you discuss this with your attorneys?

A    Whenever we met.  I don't know the exact time frame or how often we met off the top of my head.

(Defendant's Exhibit No. U marked for identification.)

BY MR. HAYS:

Q    Let me show you what I marked as Exhibit U

59

and ask if you recognize that.

A    I recognize it as a collection letter that they had sent me.  I don't the time and everything.

Q    That one is dated January the 9th.  Do you recall getting a letter?

A    I don't recall getting a letter exactly at that time, no.

Q    So when you first got the voice mail from Synter, did you call them back?

A    I don't believe I did.  I don't remember if I did or not.

Q    And you never were called by them and answered; is that correct?

A    I do not know that off the top of my head.

Q    Have you listened to the voice mail recordings?

A    Not recently, no.

Q    Do you remember the first call you got the woman on the phone said she was trying to reach accounts payable?

A    No.

Q    You don't recall that?

A    No, I do not.

Q    Do you remember writing a letter to them

to contest the charges?

60

A    I remember sending a letter to them to contest the charges.

Q    When you said sending a letter, I asked you did you write them a letter?

A    Handwrote it, no.  It was typed up.

Q    Did you type it?

A    No, I did not.

Q    Who typed it?

A    My lawyers.

Q    And do you remember when that was?

A    No, I do not off the top of my head.

Q    I'm going to show you a document I marked as Exhibit V and ask you if you recognize that.

    (Defendant's Exhibit No. V marked for
    identification.)

    THE WITNESS:  Yes, I do.

BY MR. HAYS:

Q    And what is it?

A    It's a letter telling Synter Resources that I've never had an account with FedEx and how can I have a delinquent account if I've never had an account with FedEx.

Q    And do you remember when that letter was sent?

A    Around December 11th I would assume.

61

Q    So do you remember the meeting you had with your attorneys when this --

A    Not word-for-word, no.

Q    Did they mail you the letter, ask you to send it and put it in an envelope?

A    They handed me the letter and said read this, does this look correct, and I said yes.

Q    To the extent possible, do not tell me what your attorneys told you or what you told your attorney.  That's privileged information.  That being said, that's a perfectly understandable exchange.  I'm not at all surprised that's how it went.  So they handed you the letter, you reviewed the letter?

A    Yes.

Q    Signed the letter?

A    Yes.

Q    And then gave it back to them?

A    No, I mailed it myself.

Q    You mailed it yourself?

A    Yes.

Q    So they typed up the envelope for you and all the rest of that as well?

A    No, I wrote it in my hand.

Q    You handwrote it?

62

A    Yes.

Q    So when was the last time you heard from FedEx regarding this; do you know?

A    No, I don't.

Q    At some point they stopped sending you statements?

A    Yes, to my knowledge.

Q    And when was the last time you heard from Synter?

A    I could not tell you off the top of my head. I don't know.

Q    Did you ever get any correspondence from Synter other than those letters that I showed you?

A    And the phone calls?

Q    Well, correspondence, the letters, documents.

A    I did not, to my knowledge.

Q    And you said you don't recall actually speaking with anybody there?

A    I do not recall speaking with anybody.

Q    So the only contact were the letters?

A    Voice mails.

Q    And voice mails, all right. If you could tell me in your own words -- well, first, let me go

back a step.  Your understanding from your dealings

63

with ANA was Al Landino was supposed to pay for the shipping?

A    Correct.

Q    And when FedEx Freight sent you a bill for it, you contacted them to protest you didn't owe this bill?

A    Yes.

Q    So when Synter contacted you about FedEx Freight, you knew what they were calling about; is that correct?

A    Like I said, I do not remember speaking to them personally, but from the voice mail I knew what it was in reference to, yes.

Q    You knew they were talking about a FedEx Freight, the charge, and you knew where that charge had come from?

A    Yes, correct.

Q    And then sometime after a couple of months you stopped hearing from FedEx?

A    I believe so, yes.

Q    And you stopped hearing from Synter?

A    Yes.

Q    So if you could tell me in your own words, what injuries, harm, damage you have suffered as a

125

result of hearing from Synter Resource Group?

64

A    Stress, extreme stress actually.  I was worried that I would not be able to get a job on base which I've been trying to do for ten years because my security clearance wouldn't be able to pass because I had stuff that might pop up on my actual credit score, credit report.  Time I've had to waste going back and forth to get this all resolved.  The gas, time I've had to take off of work.  Not being able to go enjoy life because I have to take time away from life to get this stuff resolved, but mainly stress about not getting a job on base because I wouldn't be able to pass a background check because of bad credit.

Q    Did you check your credit report?

A    I do check my credit report.

Q    Did the FedEx charge show up on your credit report?

A    I'm not 100 percent sure if it did or not.  I've just been waiting for it to.

Q    At any point in the voice mails or letters you got from Synter, did Synter say you owed Synter the money?

A    I do not remember the voice mails or the wording or anything about it.

Q    So the problem here is that because Al

65

Landino didn't pay FedEx, FedEx claims you owe them a thousand dollars in shipping?

A    Correct.

Q    So the bad credit you're referring to would be FedEx saying you have this outstanding bill; is that correct?

A    Correct.

MR. HAYS:  I have nothing further for the witness.

MR. DANIELS:  I have a few questions.

MR. HAYS:  Okay, you're certainly allowed to do that.

DIRECT EXAMINATION

BY MR. DANIELS:

Q    We characterized -- and I say we kind of the royal we -- earlier eBay listings as advertisements.  I think the correct vernacular is listings.  What you did was list things on eBay?

A    Yes.

Q    Did you have an eBay account prior to these listings?

A    Yes.

Q    Was it a business account?

A    No.

66

Q    You didn't have to pay a monthly subscription fee to eBay to have an eBay store?

A    No.

Q    You didn't have an eBay store?

A    No.

Q    You just made individual listings?

A    Yes.

MR. HAYS:   I'm going to object to leading the witness.  Just -- I know where you're going, but since we're objecting to form of the questions, you've been leading the witness. That you could ask him questions to get the testimony in his words and not yours, please.

MR. DANIELS:   Okay.

BY MR. DANIELS:

Q    Did you actually go in the FedEx store?

A    Yes, I walked into the freight center.

Q    Was there a counter there?

A    Yes, there was.

Q    Was there -- were you able to notice whether there were postings about shipping?

A    No, there weren't really postings about shipping.  It was just someone behind the counter sitting at a desk taking orders, I would assume.

Like, they didn't have freight prices or anything

67

like that on the wall.

Q    Did you ever sign a bill of lading?

A    No, I did not.

Q    Did you fill out a bill of lading?

A    No, I did not.

Q    If somebody signed -- are you aware of who signed the bill of lading?

A    It was a representative of ANA Instruments.  It was either Al Landino or the guy's name inside the emails.

Q    I want you to look at Exhibit V.

A    Yes.

Q    Did you ever receive any returned mail?

A    No, I did not.

Q    Did you ever receive a response to that letter?

A    No, I did not.

MR. DANIELS:  I have nothing further.


RECROSS-EXAMINATION

BY MR. HAYS:

Q    Just to clarify since the question was asked.  I'm going to mark this document Exhibit W and ask you if you recognize that.

133

/ / /

68

(Defendant's Exhibit No. W marked for identification.)

THE WITNESS:  I do.

BY MR. HAYS:

Q    And that's a copy of a bill of lading, correct?

A    Yes.

Q    And there's a number of copies of that bill of lading in amongst the FedEx statements when you were looking at them before earlier, correct?

A    Yes.

Q    And your testimony is you did not fill that out.  It was filled out by Al Landino or someone at ANA?

A    Yes.

Q    And, in fact, they emailed it to you; isn't that correct?

A    That is correct.

Q    And you printed it off yourself?

A    Yes.

Q    Was that at home or at the office?

A    I believe I was at my job after hours.

Q    Printed off the bill of lading to take to the FedEx Freight?

A    Yes.

69

Q    So that is the document you handed across the counter?

A    Yes.

Q    Now, in handwriting that is the address 306 Emory, did you write that in there?

A    No, I did not.

Q    Who did?

A    Whoever filled this out at ANA Instruments.

Q    ANA instruments filled that out?

A    Yes, they did.

Q    Let me go back to the emails if we could.

MR. DANIELS:  Exhibit L, 64 and 65.

MR. HAYS:  Yes, that is exactly what I want.

BY MR. HAYS:

Q    Flip over to page 64.  That's another one of the emails.  In fact, that one's headed also from you to your attorney forwarding this document.  Is this a copy of what you printed out?

A    It is.

Q    And so you took the print version of this and took it to FedEx?

A    That is correct.

137

Q    Does it have the Emory Circle address on

70

it?

A    No, it does not.

Q    So does that refresh your recollection about what might have happened --

A    Yes, it does.

Q    What's your recollection of?

A    The person at FedEx filled it out.

Q    Okay.  Do you remember them asking you for your address?

A    Yes, I do.

Q    Did you give them anything else at that point?

A    No.

Q    So you wrote in the address?

A    I did not write in the address.

Q    He wrote in the address?

A    The lady at FedEx wrote in the address.

Q    It was a lady?

A    Yes.

Q    Okay.  Filled in that information.

MR. HAYS:  With that clarification, I'm also done.

(Deposition concluded at 12:28 p.m.)

71

DISCLOSURE

STATE OF GEORGIA:

COUNTY OF BIBB:

        Pursuant to Article 10.B of the Rules and Regulations of the Board of Court Reporting of the Judicial Council of Georgia, I make the following disclosure:
        Combs Court Reporting, Inc. was contacted by the party taking the deposition to provide court reporting services for this deposition, and there is no contract that is prohibited by O.C.G.A. 15-14-37(a) and (b) or Article 7.C of the Rules and Regulations of the Board for the taking of this deposition.
        There is no contract to provide reporting services between Combs Court Reporting, Inc. or any person with whom Combs Court Reporting, Inc. has a principal and agency relationship, nor any attorney-at-law in this action, party to this action, party having a financial interest in this action, or agent for an attorney-at-law in this action, party to this action, or party having a financial interest in this action.  Normal and customary rates will be charged, and a financial discount will not be given to any party in this litigation.

                        Mary Beth Cook, RPR
                        CCR# 5079-8707-4272-4608

72

CERTIFICATE

STATE OF GEORGIA:

COUNTY OF BIBB:

I, Mary Beth Cook, Certified Court Reporter, State of Georgia, Certificate No. 5079-8707-4272-4608, CERTIFY that acting in such capacity, I reported the testimony herein, and on the foregoing pages have transcribed a true and correct transcript thereof.

I FURTHER CERTIFY that I am not counsel for, nor am I related to any party to the above case; nor am I interested in the event or outcome.

WITNESS my hand and official seal as Certified Court Reporter, State of Georgia, Certificate No. 5079-8707-4272-4608 this 2nd day of August, 2018.

_____
Mary Beth Cook, RPR, CCR
CCR# 5079-8707-4272-4608

73

E R R A T A   P A G E

IN RE:  Cross v Synter Resource Group

I, ASA CROSS, the witness herein, have read the transcript of my testimony and the same is true and correct, to the best of my knowledge, with the exception of the following changes noted below, if any:

Page / Line             Change            / Reason

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

_____        _____

                        _____
                        ASA CROSS

Sworn to and subscribed before me, this the \_\_\_\_\_ day of _____, 2018.

                        _____
                        Notary Public

My commission expires: