UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF GEORGIA
MACON DIVISION

ASA CROSS,

    Plaintiff,

    vs.

SYNTER RESOURCE GROUP, LLC,

    Defendant.

Civil Action
No. 5:17-cv-00446-MTT

| | |
|---|---|
| 30(b)(6) DEPOSITION OF: | SYNTER RESOURCE GROUP, LLC BY: JOHN J. CHURCH |
| DATE: | May 11, 2018 |
| TIME: | 8:54 AM |
| LOCATION: | Synter Resource Group, LLC 5935 Rivers Avenue, Suite 102 North Charleston, SC |
| TAKEN BY: | Counsel for the Plaintiff |
| REPORTED BY: | SANDRA K. BJERKE, RDR, CRR, CBC |

A. WILLIAM ROBERTS, JR. & ASSOCIATES

Fast, Accurate & Friendly

Charleston, SC   Hilton Head, SC  Myrtle Beach, SC
(843) 722-8414   (843) 785-3263   (843) 839-3376

Columbia, SC     Greenville, SC    Charlotte, NC
(803) 731-5224   (864) 234-7030    (704) 573-3919

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

2

APPEARANCES OF COUNSEL:

ATTORNEYS FOR THE PLAINTIFF
ASA CROSS:

CLIFF CARLSON LAW, PC
BY:  CLIFFORD CARLSON
1114-C1 Highway 96, #347
Kathleen, GA  31047
(478) 254-1018
cc@cliffcarlsonlaw.com

and

DANIELS LAW LLC
BY:  RONALD EDWARD DANIELS
PO Box 1834
Perry, GA  31069
(478) 227-7331
ron@dlawllc.com

ATTORNEYS FOR THE DEFENDANT
SYNTER RESOURCE GROUP, LLC:

HAYS, POTTER & MARTIN, LLP
BY:  JAMES "BEAU" HAYS
3945 Holcomb Bridge Road, Suite 300
Peachtree Corners, GA  30092
(770) 934-8858
beau@hpmlawatl.com

(INDEX AT REAR OF TRANSCRIPT)

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

3

(Whereupon, the oath was administered to the witness by the court reporter.)

MR. CARLSON:  All right.  We're on the record with -- this is Asa Cross versus Synter Resource Group.  This is the 30(b)(6) of Synter Resource Group.  The case number is 5:17-cv-00446.

We are at, I believe, 5935 Rivers Avenue, Suite 102, Charleston, South Carolina.  The Zip Code's 29406.  It is May 11th.  It's almost 9 o'clock.  8:54.

I'm Clifford Carlson.  I represent Mr. Asa Cross.  Next to me is Ronald Daniels who also represents Asa Cross.

And I'll let you two introduce yourselves.

MR. HAYS:  Well, for the defendant, Beau Hays for Defendant Synter Resource Group.  Mr. Church is the 30(b)(6) representative designated by Synter.  John Church.

JOHN J. CHURCH

being first duly sworn, testified as follows:

EXAMINATION

5

BY MR. CARLSON:

Q.   All right.  Have you ever done a deposition before, Mr. Church?

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

4

A.   No, sir.

Q.   First time?

A.   Yes, sir.

Q.   All right.  Well, congratulations.  I'm sure your attorney's explained a lot, and I'm going to go over some ground rules.  A little unusual, as you can probably imagine.

We have someone taking very good notes and she types fast.  According to her laptop, 225 words a minute, but I'm still not sure how well she can type if we're both talking at the same time.  So it's important that one of us try to talk at once.  And I'm going to be the most guilty of doing that but something I'll try to do.  And if you can try to do as well, that would be great.

The other thing is, when we ask questions it's very unnatural for us, especially in the South, to say yes and no, you know, versus nod and uh-huh.  I'm certainly guilty of that.  And

fortunately I can get away with that because my answers don't matter, but yours do.  So I will remind you.  Please don't be offended.

MR. HAYS:  I will too.

MR. CARLSON:  Yes, please do. Anybody can jump in and ask to do that.  I would appreciate

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

5

that.

BY MR. CARLSON:

Q.   I would also suggest -- obviously, your attorney probably told you this too -- is try not to answer the question right away.  Give him the opportunity to object if that's what he wants to do.

What ends up happening on many of these is the attorney's asking a question and the other party is already answering before the attorney's finished asking and the other attorney's objecting at the same time.  So you've got three people talking, and the court reporter is like, whatever. I don't know.  So we'll try not to do that.

I'm going to hand you what I'm going to mark as Plaintiff's Exhibit B.  We've already used A with the complaint.

(PLF. EXH. B, Notice of 30(b)(6) Deposition dated 5-3-18, marked for identification.)

MR. CARLSON:  Just so the record's clear if anyone has any questions.  There's a copy for you.  So this is the 30(b)(6) notice.

MR. HAYS:  Right.  Yeah.  Thanks.

BY MR. CARLSON:

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

6

Q.    Hopefully that won't be a surprise to you.  Have you seen this before?

A.    Yes, sir.

Q.    Okay.  I don't know if your attorney -- I'm not -- certainly don't tell me what you discussed with your attorney.  I just didn't know if he showed it to you or just kind of mentioned what you should be ready for.

If you go to Page 2 of 4 there's some deposition topics.  10 of them, actually.  Are you prepared to discuss all 10 today?

A.    Yes, sir.

Q.    Okay.  So you're going to be the only 30(b)(6) deponent?

A.    Yes, sir.

Q.    Okay.  The reason I ask that is sometimes we can have 50 30(b)(6) deponents if we have -- well, even with 10 topics they could designate various people to answer various questions.  So I like to ask and make sure that -- who all is going to be testifying on behalf of Synter Resource Group, and it sounds like that's

11

just you, which is fine.

You are aware that whatever you say binds Synter Resource Group.


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

7

A.    Yes, sir.

Q.    Okay.  And I will try when I'm -- it may get awkward, but I will try to indicate when I'm asking your knowledge versus the corporation's knowledge.

A.    Okay.

Q.    Sometimes I'll say you and mean both.  But if you have any questions when I ask something like that you can please ask me to clarify --

A.    Okay.

Q.    -- if I'm asking about your knowledge or the corporation's knowledge.

MR. HAYS:  I will try to catch those as well.

THE WITNESS:  All right.

BY MR. CARLSON:

Q.    Just a second here.  What all did you review, I guess, before -- well, let me back up a little bit.  What's your job here at Synter?

A.    I'm a -- the vice president of operations.  I'm one of the owners of the company,

but I oversee the operations of the company.

Q.    How many owners are there?

A.    Three.

Q.    What are their names?


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

8

A.    Mike Daugherty and Reggie McCaskill.

Q.    Are they all active owners?

A.    Yes, sir.

Q.    Okay.  So what is your day-to-day function here?

A.    Oversee the operations, the team leads.

We do accounts receivable management for the -- primarily the freight and transportation industry, and I just oversee the operations of the company.

Q.    Okay.  How many employees do you have here?

A.    Roughly 150.

Q.    Wow.  All in this location?

A.    Yes, sir.

MR. HAYS:  If I can clarify, you do have a couple of people who work remotely.

THE WITNESS:  Yes, we do.

MR. CARLSON:  Okay.

THE WITNESS:  I'm sorry.

MR. CARLSON:  That's --

MR. HAYS:  I know this --

MR. CARLSON:  Not critical for us, but

yes.  Thank you.

                    MR. HAYS:  The one I deal with most of

the time is remote.


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

9

MR. CARLSON:  Okay.

MR. HAYS:  So that was -- it may come up later and so I wanted to go ahead and get that corrected so it doesn't puzzle you later.

THE WITNESS:  Sorry about that.

BY MR. CARLSON:

Q.  No, no.  Have you seen the complaint we filed in this case?

A.  Yes, sir.

Q.  Okay.  Are you aware of -- obviously, you're aware of Mr. Asa Cross's allegations, I presume.

A.  Yes, sir.

Q.  Have you reviewed his account information?

A.  Yes, sir.

Q.  What all did you review?

A.  I've just reviewed the account itself, the account notes, some of the shipment detail.

Q.  What account notes are you referring to?

A.  I think it -- I think I've seen it in

17

part of the discovery, but the account notes where

it shows where Synter Resource Group sent a letter

out like at the beginning when we first received

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

10

the account.

Q.   Um-hum.

A.   And it also shows where we made four phone calls on the account.  We just left voice mails, you know, for the customer.  And then it just showed that after our time period to work the account it was closed in our system and sent back to Fed Ex.

Q.   What --

MR. CARLSON:  I'm sorry.  Were you going to ask a question or...

MR. HAYS:  No.

MR. CARLSON:  Okay.

MR. HAYS:  I was just going back into the documentation.

MR. CARLSON:  Okay.  I thought you were going to ask me something.  Sorry.

BY MR. CARLSON:

Q.   So what system do you use to track your account notes or keep account notes?

A.   It's called FACS.  It's a software that

19

we use for all our accounts.

Q.   How would you spell that?

A.   F-A-C-S.

Q.   Okay.  And it keeps records of

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

11

everything?

A.    Yes, sir.

Q.    Does it keep recordings of phone calls?

A.    No, sir.

Q.    Do you have another system that records phone calls?

A.    Yes, sir.

Q.    Okay.  Were the calls to Asa Cross recorded?

A.    Yes, sir.

Q.    Does that FACS system, does it allow you to print account notes?

A.    Yes, sir.

MR. CARLSON:  Was that provided to us?

MR. HAYS:  That's what I was looking for.  It doesn't appear they printed out the notes of the FACS system to do that.

MR. CARLSON:  Okay.

MR. HAYS:  Can we do that fairly quickly?

THE WITNESS:  Yeah.  I've got it on my

laptop, the account notes.

MR. HAYS:  Let's take a break and get those printed out for you --

MR. CARLSON:  That would be great. We

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

12

can do that.

MR. HAYS:  -- since you may very well want to talk about them right now.

THE WITNESS:  Sure.  Okay.

MR. HAYS:  So let's do that.

MR. CARLSON:  We'll go off the record then.

(A recess transpired from 9:02 until 9:05.)

MR. CARLSON:  Back on the record.

BY MR. CARLSON:

Q.  So you mentioned that your primary business is collecting for -- debts on -- or debts for like Fed Ex and -- you used a different term. I forgot.  But it's Fed Ex, UPS, those types of --

A.  Right.  Freight and transportation companies.

Q.  Freight and transportation.  Okay. You don't collect debts for anyone else?

A.  No, sir.

Q.  Do you limit the debts you collect to any geographical area?

23

A.    No, sir.

Q.    So you collect debts from people in New York, Georgia, Florida?

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

13

A. Yes, sir.

Q. Anywhere.

A. (Witness moves head up and down.)

Q. Okay. How long have you been in business?

A. Synter Resource Group, it will be 16 years in August of this year. We opened up in August of 2002.

Q. Do you know how many accounts you have or how many collections you have related to entities or individuals in Georgia?

A. No, sir, I don't have that off the top of my head.

Q. Is it more than 10?

A. I'm not sure.

Q. Do you have any?

A. Accounts in Georgia?

Q. Right.

A. Yes, sir.

Q. Okay. And what I mean by accounts is people you're collecting from, not for.

A. Yes.

Q.   Okay.   Would you say you're doing business in the state of Georgia?

A.   Yes.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

14

Q.   Do you have any assets in Georgia?

A.   No, sir.

Q.   What assets does Synter Resource have?

A.   I mean, we've got computers, we've got servers, like phone switch, phones, furniture, cubicles, you know, the equipment, furniture in here.

Q.   Do you have any real estate property?

A.   No, sir.  We -- no.

Q.   Okay.  I presume you're renting here?

A.   Yes, sir.

Q.   Just based on the location.

A.   Um-hum.

Q.   Okay.  So you have no property in Georgia.

A.   No, sir.

Q.   You may recall the complaint -- actually, I'll give you a copy of the complaint. It might make it easier, which I will mark as Exhibit C.

(PLF. EXH. C, Complaint dated 11-11-17, marked for identification.)

27

MR. CARLSON:  There's a copy for you.

THE WITNESS:  All right.  Thank you.

MR. CARLSON:  There's a copy for you,

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

sir.

BY MR. CARLSON:

Q.   And what I'm going to refer to is -- at least for now is Line 15 or I call it Paragraph 15.  It's on Page 3 of 8.  There's a December 5th, 2016 phone call to Mr. Asa Cross.  Or that's what we allege.  Do you agree there was a phone call made on December 5th, 2016?

A.   Yes, sir.

Q.   Why did you call him?

A.   We called them -- we received the account, A-S-A Cross, from Fed Ex and was put in our system and we sent a letter out and then we make a call trying to help collect the freight charges for that particular shipment.

Q.   Okay.  So you were collecting a debt.

A.   Yes, sir.

Q.   Okay.  Did you call an automated dialer?

A.   No.

Q.   Do you have an automated dialer?

A.   We do have an automated dialer.

29

Q.   How do you know you didn't call an automated dialer?

A.   If you look at our account notes that I

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

16

just brought in just a few minutes ago it says UAM complete, call canceled, GCN.  That would be the dialer, but in this particular -- for this particular account we didn't -- the dialer didn't actually call it, but we do have a dialer.

Q.  Okay.  I think I'm tracking.  I'll save my confusing questions for that later.  But okay.  So you have a dialer.  What dialer do you have?

A.  Global Connect dialer.

Q.  Global Connect.  When do you use the automated dialer?

A.  It just varies based on the different projects we work or customers we work.  There's no rhyme or reason.

Q.  If you look at 17, we're alleging that you left a voice mail on his cell phone.  That was denied, for whatever that's worth, in the answer.  I was curious as to whether or not you would assert now that there was a voice mail left.  I can print you the answer, but --

MR. HAYS: That's all right.

BY MR. CARLSON:

Q. You don't have to -- ignoring what I said about the answer, would you agree that you left a voice mail?

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

17

A.    Yes, we left a voice mail, based on the account notes on the system.

Q.    And you have recordings of the voice mail you left?

A.    Yes, sir.

Q.    Okay.  And did you disclose in that voice mail on December 5th that you were a debt collector?

A.    On that particular call we didn't.  We thought it was a commercial account.

Q.    Okay.  Why did you think it was a commercial account?

A.    When we looked at the -- the first thing we do is we look at the freight, the freight documents or the billing, the shipment details.  And first off, we thought that, you know, someone shipping 600 pounds of used lab equipment wouldn't be something that a consumer would send and go put on a loading dock to have shipped to a A&A -- I forget the last part of their company.  And we had

no reason to think it was a consumer debt when we got the business, got the account.

Q.    Did you ever later decide it was not a commercial debt?

A.    No.  We think it was -- always thought

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

18

it was a commercial debt.

Q.   So you never disclosed -- or you never had a phone message where you disclosed that you were a debt collector?

A.   Yes, we did.

Q.   Why did you do that?

A.   Some of our collectors prefer to edge on the side of caution and leave a more consumer-oriented voice mail just to cover themselves.  I mean, it's not -- doesn't hurt if we do that even on a commercial account.  So the other phone calls by the other representative is typically she always just left a consumer message if she was unsure.

Q.   So they were unsure if it was a consumer versus --

A.   I'm not sure if she was or not.  She always -- she's one that always just leaves that message, regardless of who she's -- regardless of what the account name is.

Q.   So there's nothing in your system that

35

tells her which message to use.

A.   No, sir.

Q.   What all did Fed Ex give you?

A.   What do you mean, what...

19

Q.    Just describe what Fed Ex sent you when

they sent you the account.

A.    They sent us the EDI placement file. That includes a number of accounts that they want us to help them collect on.  And we load that into

our system, and that's what they sent us.

Q.    What's included in that EDI file?

A.    Customer name, I mean, address that they had last on record.  If there's a phone number

they provide us the phone number.  For Fed Ex we get the bill detail, like who it was shipped from,

shipped to, what was shipped, the weight and that.

Like I think the address.  Just bill -- a lot of

the bill detail.

Q.    Okay.  So you determined, based on that

EDI file, that it was a commercial debt.

A.    Yes, sir.

Q.    If you look at Paragraph 27 -- it's on

Page 4 of 8 -- plaintiff sent a letter December 11,

37

2016.  My understanding on the answer is that you're claiming you didn't receive that letter.

A.    No, sir.

Q.    Okay.  I, unfortunately, did not print that letter for this, but I will pull one up real quick.


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

MR. HAYS:  I believe it was attached to the complaint.

MR. CARLSON:  It was.

MR. HAYS:  I should have a copy here.

MR. CARLSON:  If that works.  If you want to -- if you find your copy I will read mine and you can agree or disagree with me based on what it says.

MR. HAYS:  I'm not going to be concerned with -- I suspect we're not going to disagree.

MR. DANIELS:  Well, I don't know.  He did get his public education in Texas.  Reading and comprehension skills are somewhat less than desirable.

MR. HAYS:  Just to verify.

MR. CARLSON:  It looks like it, yep.

MR. HAYS:  Okay.

MR. CARLSON:  So that's what I'm asking about.

MR. HAYS:  It's attached as Exhibit A

to the complaint, and you can refer to it that way.

MR. CARLSON:  Okay.  Yeah, this would be Exhibit A which we did attach to the complaint.

BY MR. CARLSON:

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

21

Q.   Is that your address?

A.   Yes, sir.

Q.   Is there anyone else that -- how do you get your mail here?

A.   I've got a -- we got -- the postman each day comes in and just drops the mail off.

Q.   Inside?

A.   Yes, sir.

Q.   Does he ever drop it with a neighbor?

A.   No, sir.

Q.   Is there anyone else that could have gotten your mail?

A.   Not to my knowledge.

Q.   So if Mr. Cross put this address on it and put it in the mail, it should have gotten here; right?

MR. HAYS:  I'm going to object to that as calling for undue speculation about the ability of the postal service to do their job.

MR. CARLSON:  I'll let you take that up

41

with them.  I'm not disagreeing with you, but I think there's some case law that says we're going to assume they do, whether that's right or wrong.

MR. HAYS:  This may be, but you've asked the witness a fact question --

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

22

MR. CARLSON:  Sure.

MR. HAYS:  -- that assumes something he

doesn't know.

BY MR. CARLSON:

Q.  Have you ever had an issue getting mail

before?

A.  No, sir.

Q.  Now if you're -- obviously you're

saying you didn't get the letter, but if you read

the letter would you say the letter says or

requests that you verify the debt?

A.  Yes.

Q.  And was the debt ever verified?

A.  We never received a letter, so no.

Q.  Okay.  Where on the inside does the

postal employee drop the letters off?

A.  Right when y'all walked in, into our

lobby area and --

Q.  So --

A.  Go ahead.  I'm sorry.

Q.  So he's buzzed in?

A.  Yes, sir.

43

Q. Okay. Does he drop it off like at the

counter or hand it to somebody or...

A. Yes, sir.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

23

Q.   So it could be either one?  He could just drop it off or he could hand it --

A.   No.  He hands it to whoever's the -- who's up there at the front desk.

Q.   Do you trust the US Postal Service to deliver letters?

A.   I've had -- do I trust...

MR. HAYS:  I'm going to object to that question as well, but...

MR. CARLSON:  Well, what's the basis?

MR. HAYS:  Are you referring to him personally or the company?

MR. CARLSON:  Both.

BY MR. CARLSON:

Q.   Do you personally trust the US Postal Service to deliver mail?

A.   Yes.

Q.   Okay.  Does Synter Resource have an opinion?

A.   I mean, we receive the mail that we receive.  I can't say what we didn't receive got mailed or didn't get mailed or dropped off.

Q.   You send letters; right?

45

A.    We have a company that sends letters for us.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

Case 5:17-cv-00446-MTT    Document 15-7    Filed 09/10/18    Page 47 of 312

24

Q.   Oh.  So you don't mail any letters?

A.   I mean, me personally?

Q.   Well, the -- Synter, Synter Resource. I'm sorry.

A.   We do mail letters, yes.

Q.   Okay.  But you use a company to mail as well?

A.   No.  We just use a company to mail letters on our behalf.

Q.   Okay.  Aside from the letters that go out from that company --

A.   Uh-huh.

Q.   -- does Synter Resource mail letters?

A.   Yes, sir.

Q.   What makes you decide whether to go with that company or mail them yourself?

A.   All new accounts that come in to Synter get sent by the company on our behalf.  If we speak with a customer or debtor and they request certain information, we would potentially mail it ourselves.

47

Q.   Okay.  When you mail you use the postal

service?

A.   Yes, sir.

Q.   What's the name of this company?


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

25

A.   I'm not sure.  I could -- I can find that out for you, but I don't know right off the top of my head.

Q.   Is that something we can find on a break, probably?

A.   Yes, sir.  I could make a call or go ask.  I mean, I think I know what the name of it is, but I want to be a hundred percent sure.

Q.   Sure.

MR. HAYS:  We'll get that information for you before the end of the day.

MR. CARLSON:  Okay.  Sounds good.

BY MR. CARLSON:

Q.   Do they mail US Postal Service?

A.   Yes.

Q.   How do you communicate with this company?

A.   I mean, we send them files.  I'd have to talk to our IT department to get the actual details, but we get a new placement and we send them a file and it's -- they send the letters out.

Q.   So I'm going to -- I think I know what

49

they're probably doing, but I'm going to see if you

agree.  You're sending names and accounts over and

they've got a list of letters/templates they send

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

26

out on a schedule.  Is that what they're doing?

A.   I mean, I wouldn't say they have a template of letters, but --

Q.   Well, tell me in your words then.

A.   You know, I mean, we send -- we have a -- we get a placement and we load it in our system and in our system it says letter requested.

And then it gets to our letter company and they send out the specific letter that we want for those accounts.  It's not -- yeah.

Q.   So is it -- so they already have the letters before you send the account name over or the account information over.

A.   When we send the file it will have all the account detail, but they get that from us.

Q.   So when you send the file over, do you send the letters and the account detail, or is the letter's already there?

A.   The letter's already there.

Q.   Okay.  So it's a template.

A.   Yes, sir.  Sorry.  Yeah.

51

Q.   That's okay.  I'd rather hear it in your words.  I just want to kind of -- it's difficult sometimes to go down that road in a deposition, so -- at least timely.


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

27

Do you tell them specifically when to send a particular letter?

A. We request the letter. I mean, we don't tell them. We -- no, we don't tell them specifically. Typically they get the request and it's usually the next business day.

Q. Right. But you don't say send the letter tomorrow versus send a letter on this schedule. You know, one every -- first day of the month for the next four months.

A. No, sir, we don't do that.

Q. So you tell them send the letter as soon as you can.

A. Yes, sir.

Q. Okay. And it's done one file at a time or is there a group file or something else?

A. It's just we get a placement -- you know, for each placement that we get they get a file. Like placement for each customer we have. So we get -- may get a placement from Fed Ex that has X number of customers or accounts, and then we may get a placement for another one of our

53

clients.

Q.    Okay.  So when you send the placement over, it's a onetime deal per consumer or per debtor, or do you send multiple placement files

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

28

over?

A. We send a -- we send the file over when we initially get the placement.

Q. Okay. So I'm assuming you tell them when you send the file over to send a particular letter out.

A. Yes, sir.

Q. And you send more than that first letter, though; right?

A. We do, depending on the account situation.

Q. So do you -- how do you tell them to send the second letter out?

A. We just -- we request it in the system.

Q. Which system is that?

A. The FACS system.

Q. So they're tied into the FACS system somehow.

A. I don't think they're tied into -- I'm not sure.

Q. But that's the only way you communicate

with them, as far as sending letters out, is through that system from your end.

A. Correct.

Q. Okay. How many letter templates do you

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

29

have?

A.   I couldn't give you a -- I don't have a good number.

Q.   Do you tell them which letter, which template to use?

A.   Yes.

Q.   Is it always the same template?

A.   No.

Q.   Okay.  How many templates did you use for Asa Cross?

A.   Well, I mean, for this particular account it was just -- we call it letter 1401.  It was just our initial dunning letter.

Q.   Okay.  So that's the first one you send out.

A.   Yes, sir.

Q.   And that's what they do when they get the file initially.

A.   Yes, sir.

Q.   And what letter do they send after that one?  Do you know the template number off the top

57

of your head?

A.   No, sir, not off the top of my head. Well, actually, I mean, I can tell you.  If you look on the account notes on December 8th it's

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

30

letter request 1401 and it's got letter 14012, which is like a second letter.  If you look at the first one that was sent out it's letter, you know, 1401.  And then on January 7th it's letter 14013. We're required by Fed Ex to send letters out every so many days if we're not -- if we don't make contact with the customer.

Q.   But -- okay.  But you sent the same letter out.

A.   It was a different --

Q.   The same template, anyway.

A.   The same template but with some different verbiage.

Q.   What would the verbiage differences be?

A.   I'd have to -- I'm not sure if we have that.  I mean, they're -- they may all be the same verbiage.  Just a collection notice.

Q.   I suspect -- not to put words in your mouth, but I suspect the date's different, but...

A.   Yes, sir.

Q.    That's probably.  Does Fed Ex have any

input to the letters you send?

A.    When we first started working with them

14 years ago we had to get their -- them to approve

the letters that we send out.


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

31

Q. And they require you to -- you said they require you to send the letter out every so many days?

A. Yes, sir.

Q. Is that, I guess, in their contract with you?

A. Um-hum.

Q. Okay. So there is a contract between you and Fed Ex.

A. Yes, sir.

Q. Do you -- and by you I mean Synter. Do they loan any money?

A. Does Synter loan any money?

Q. Right.

A. No, sir.

Q. Do you service any accounts for like doctors' offices or someone who doesn't service their own accounts?

A. No, sir.

Q. Do you sell anything?

A. No, sir.

Q. What exactly do you do?

A. We do accounts receivable management

61

for the freight and transportation industry.  We provide different services and solutions to help

32

our customers improve their cash flow.

Q.   What do you do other than collecting on these accounts?

A.   That's all we do.

Q.   Okay.  Do you get any accounts that are not in default?

A.   Do we get any...

Q.   Let me rephrase that.  Do you get any accounts where someone's actively paying on it prior to you getting it?

A.   Yes.

Q.   Who would -- who sends you those accounts?

A.   It varies.  I mean, it could be Fed Ex.  It could be whomever.  I mean, they have -- from what I understand, they have certain criteria before they send an account over to companies like ours.  I don't know the particular criteria.

But if it reaches a certain age, like, say, 90 days, they're going to send it to us regardless, even if the customer was making

payments to them.  Because obviously, they want to

get the account paid in full, and so there could be

a case where accounts come over to us where

payments have been made.


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

33

Q.   How would you know there was payments being made?

A.   When we call and speak to the customer the first time.

Q.   So the account, when you get it, is delinquent.

A.   Yes, sir.

Q.   Okay.  If you look at Paragraph 31 in the complaint, it says you continued -- this is our allegation, was you continued to attempt to collect the alleged debt from the plaintiff despite not conducting any investigation into his dispute.  That was denied.  So you did some sort of investigation?

A.   No, sir.

Q.   So no investigation was done.

A.   No, sir.

Q.   Okay.  Was this account different than any other account you got from Fed Ex status-wise, aside from his name and address?

A.   No, sir.

65

Q.   So it was in default.

A.   Yes, sir.

Q.   And you are authorized to collect debts for Fed Ex.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

34

A.   Yes, sir.

Q.   What authorizes you to do that?

A.   We've got a contract with them where they allow us to do that on their behalf.

Q.   Where is that contract?

A.   It's somewhere here in the office.

MR. CARLSON:  Can we get a copy of that?

MR. HAYS:  I don't see why that would be a problem.  I was just looking at the request to see if it was something that should have been produced before.  If it wasn't quite in there, that's okay.  It's still timely.

MR. CARLSON:  Well, no.  Actually, it's not, but that's okay.

MR. HAYS:  You're here and you're asking questions.  The purpose --

MR. DANIELS:  We've got discovery time left.

MR. CARLSON:  Yeah.

MR. HAYS:  That's what I mean.

MR. CARLSON:  Oh, sorry.  Okay.

67

MR. HAYS:  It is a timely request for pretrial discovery.

MR. CARLSON:  I'm not objecting right

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

35

now.  Yeah.

MR. HAYS:  I will not object on the grounds that it's an untimely request or that it's in any way not relevant, so we'll see what we can do to get that.

MR. CARLSON:  Should we take a quick break?  Are you okay with that?

MR. DANIELS:  I'm good.

MR. CARLSON:  Take a quick break.

THE WITNESS:  Sure.  Okay.

MR. CARLSON:  We'll go off the record for a second.

(A recess transpired from 9:31 until 9:40.)

MR. CARLSON:  So we're back on the record.

BY MR. CARLSON:

Q.  I just want to confirm you handed me a sheet that's got DataMatx -- DataMatx -- I'm going to spell it because I'm not saying it right. D-A-T-A-M-A-T-X, Inc.  That's right.  And that's your letter servicer?

69

A.    Yes, sir.

Q.    And I assume Katherine Griffith is the --

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

36

A.    Is our contact.  Who we deal with, our contact.

Q.    Contact.  Okay.  And we presume they're using the postal service to mail since there's no other option, really, but -- I guess they could Fed Ex, but that would get expensive.

A.    That would cost too much money.

Q.    Yeah.  They're expensive.  All right. Who -- you mentioned before you decided this was -- I may be mischaracterizing what you said.

But at some point a determination was made that this was a commercial account and not a consumer account when you received it.

A.    Correct.

Q.    Who made that determination?

A.    Just -- I mean, when our -- the first person that worked the account looked at it and thought it was a commercial -- deemed a commercial account.  There was nothing that said that was a consumer account.

Q.    Where does it say -- well, who's the

71

first person that looked at it?

A. It would have been Dominique Serrano, which was -- her initials are DNS on the account notes.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

37

Q.   And she determined it was commercial, not consumer.

A.   Correct.

Q.   Where does it -- how do you know she determined that?

A.   She left a voice mail on a -- a commercial voice mail.

Q.   So there's nothing in the account notes -- and we're going to get to this in more detail later.

A.   Right.

Q.   But there's nothing in the account notes right now that indicate this was a commercial debt.

A.   Correct.

Q.   So either -- I guess there could be other options.  Either she determined it was commercial and used the correct voice mail or she didn't and used the wrong voice mail.

MR. HAYS:  I'm going to object to the characterization of wrong.

MR. CARLSON:  Well, if it wasn't a commercial debt, then that would be the wrong

voice mail; right?

MR. HAYS:  I think you can be specific

38

about what is -- the characterization -- part of

your case is whether or not leaving a voice mail

with a message in it is wrong or right -- is

legally right or wrong.  And so to the extent that

he's being asked to characteristic whether

something was wrong in that sense, I mean...

MR. CARLSON:  Well, so she --

MR. HAYS:  If you just clarify the

question I'm sure we can get there.

BY MR. CARLSON:

Q.   If the account wasn't for a consumer,

per your policy did she leave the right voice mail

or the wrong voice mile?

A.   Ask that question again.

Q.   The voice mail that was left, the

first -- we'll just say the first voice mail

because I think the second was basically the same.

If the account was for a consumer, was

that the correct voice mail per your policy or the

wrong voice mail?

A.   If the account was for a consumer it

75

would have been the wrong voice mail.

Q.   Okay.

MR. HAYS:  There.  Fair enough.

BY MR. CARLSON:

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

39

Q.   Does she -- I'm going to call her she because I don't remember her name, but -- and we're probably going to look at her initials later too. So does DNS still -- still employed here?

A.   Yes, sir.

Q.   All right.  How long has she been employed?

A.   If I recall, it's been maybe -- I think she just had her four-year anniversary.  Three or four years at the center.

Q.   That's unusually long for this industry.  I don't know if y'all are experiencing that, but that's my experience, for whatever reason.

Do you report anything to a credit bureau?

A.   We report commercial accounts to a credit bureau.

Q.   Was this account reported to a credit bureau?

A.   No, sir.

Q.   Okay.  Do you know if -- I think you

77

said her name was Dominique?

A.   Yes, sir.

Q.   Did she listen to the voice mail

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

40

message whenever she called Mr. Cross?

A.    I'm sure she did.

Q.    Okay.  I apologize for jumping around.

The Internet doctors say I have ADD, but...

So why did -- why didn't you report this account to a credit bureau?

A.    I'm not -- I'm not entirely sure.

Q.    How do you make a determination on when to report?

A.    It also -- we also have to -- our customer, Fed Ex, they would have to agree that it's okay for us to report it to the correct credit bureau, for lack of better words.

Q.    So you have to ask them?

A.    Well, I think we have -- we ask them -- not on every particular account, but that's not just Fed Ex.  I mean, we just -- some customers don't want us reporting their stuff there.

Q.    But you do at times report for accounts you get from Fed Ex.

A.    I'm not a hundred percent sure.

79

Q.   Who would know?

A.   Probably our legal coordinator, Heather Helmuth.

Q.   Is she here?

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

41

A. No. Unfortunately, she's the one that works remotely.

Q. Okay.

MR. HAYS: In Phoenix; correct?

THE WITNESS: Nevada.

MR. HAYS: Oh, Nevada.

BY MR. CARLSON:

Q. Well, we're going to have to go there.

Well, which part of Nevada?

A. I don't think -- it's a few hours from Vegas, I think.

Q. Okay. I guess you knew where I was going.

A. Yeah.

MR. HAYS: Not the good part.

MR. DANIELS: Go on the dam tour. I had a lot of damn fun on the dam tour the last time I went to the Hoover Dam.

MR. CARLSON: No dam comments in the transcript.

BY MR. CARLSON:

Q. Which credit reporting agencies do you report to?

A. I think it's just Ansonia.

Q. And if you had reported, would it be on

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

82

42

the account notes?

A.   No, sir.

Q.   How would you know if you've reported?

A.   I would have to refer to Heather.

Q.   Okay.  And I believe you said -- just make sure I'm right.  This is also in your answers,

so I think it is.  But Ansonia is the name of the CRA?

A.   Um-hum.

MR. HAYS:  That would be yes?

THE WITNESS:  Yes.  Sorry.

BY MR. CARLSON:

Q.   That's okay.  That was more for me than the transcript, I think.  But -- and that is -- I'm not familiar with them.  Do you know what they -- what is your knowledge of Ansonia?

A.   They're just a -- they report commercial debt where -- you know, the freight industry doesn't always have a lot of leverage, and people can go from one carrier to another carrier.

So they help provide information as far as -- you could go there and see if -- if I were Fed Ex and I maybe wanted to sign you up as a customer, I would look at Ansonia to see how you pay your freight bills. I mean, everybody is going to pay their

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

43

utility bills or rent bills, but it's something just to help the freight industry to see if it's worth using them -- having them as a customer.

Q.   Okay.  So it's limited to that particular industry, I guess is what you're saying.

A.   (Witness moves head up and down.)

Q.   Okay.  Do you know if you report in the name of Synter or the name of your client?

A.   I'd have to ask Heather.

Q.   Do you guys do a credit check in -- I forget the name again -- Ansonia?

A.   No, we don't do any type of credit checks.

Q.   No credit checks.

A.   Hum-um.

Q.   If someone didn't have a credit history with them, would that mean anything to you?

A.   No.

Q.   So we mentioned you do have transcripts, and this may actually be a question for Beau.  In one of the interrogatories you said transcripts are provided.  And what I'm saying is

you can work together on this one, which is unusual.

But the transcripts you're referring to

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

44

there, is that the actual script they're supposed to read or is that transcripts of the actual call?

And I can -- if that makes sense.

MR. HAYS:  Absolutely.  The copy of what was provided to me as the call transcripts were part of what was produced.  It's a single page.

MR. CARLSON:  Yeah, it's like -- it's got two little --

MR. HAYS:  Right.  He's referring to that document.

THE WITNESS:  Right.

MR. HAYS:  And so based on your record, he asked is that the script or is that what they actually left?

THE WITNESS:  I mean, that would have been what we actually left.

BY MR. CARLSON:

Q.   That wasn't something that they had to read from, a copy from that?  That was actually written down?

A.   I mean...

Q.   I'm not trying to catch you or trick you.   I'm just trying to figure out what that is, because it was -- it looked like it was something

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

45

they were supposed to read.

A.    I mean, I guess.  I mean, it's not a --

we do give them a script to follow.  So I would say, I mean, yes, they followed a script, but --

Q.    Okay.

A.    Yeah.

Q.    Do you know if on the recordings -- this is kind of what I just asked, I guess.  Are they -- does it match that exactly?

A.    From what I remember it does, yes.

Q.    Okay.  How often do you review your calls for quality assurance reportings, is what I'm asking about.

A.    Monthly.

Q.    How many do you review a month?

A.    I don't in particular.  The team leads on each specific team do.

Q.    Do you know what percentage they review?

A.    I think it's typically about 10 a month per rep as far as listening to the phone calls.

Q.   How many calls would a rep normally make in a month?

A.   Depending on the project or the customer and depending on the number of days,

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

46

anywhere from 1,500 to 2,000 calls.

Q.   So about 1 percent, this would be, give or take?

A.   Right.

Q.   Okay.  I'm not trying to hold you to a fixed number.  I just want to get a round estimate.  Okay.  And the team leads review those.  How many team leads do you have?

A.   We have 10.

Q.   How many people are those team leads responsible for, on average?

A.   It varies.  I mean, it varies.  I mean, anywhere from eight to 12.

Q.   Okay.  Not a hundred, not zero.

A.   Correct.

Q.   In the last three years have you done anything other than collect debts?

A.   No, sir.

Q.   So all your income comes from that industry.

A.   Yes, sir.

91

Q.   Okay.  Do you have to register as a
debt collector in South Carolina?  You can answer
this, too, because I don't know.  Is that a
requirement here?


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

47

A.  I mean, we're licensed to collect in South Carolina.

Q.  Okay.  Are you licensed in any other states?

A.  Yes, sir.

Q.  What states?

A.  I think we're pretty much -- I think all the states that we're required to we are.

Q.  What requirements does South Carolina impose or make you do other than just registering?

A.  I think that's it, but I'm not a hundred percent sure.

Q.  They don't have any insurance requirements or bonding requirements, anything of that nature?

A.  We have -- like I know -- I mean, I don't know if South Carolina does or not, has any bonding insurance or anything like that.

Q.  Are you registered with Minnesota as a debt collector?

A.  I would have to check, but I'm pretty sure, but I would like to check to make sure.  Or I

can check to make sure.

Q.  Do you have insurance or bonds?

A.  Yes.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

48

Q.   Okay.  Where would be a copy of that insurance policy?

A.   Here, that I can get.

Q.   Would you be able to get a copy of that?

A.   Yes, sir.

Q.   Does -- I think you called it the FACS system.  Does the FACS system have a user's guide or some other kind of manual that tells you how to use it?

A.   Yes, sir.

Q.   Would you be able to get a copy of that as well?

A.   Yes, sir.

MR. CARLSON:  What I'm going to hand you now is what your responses were for our requests for production.  It's not Bates stamped, so it's going to be a little bit confusing maybe.  I'm just going to hand you the whole stack and we'll probably go through and mark certain things as exhibits.  I think that will be easier.

And actually, I might even -- I might

just go through them and not mark them as exhibits

right now.  I think they're going to come up again

later.  You can actually skip the legalese, if you

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

49

will.

After that there's the call transcripts. You can skip that. We've already talked about that. Well, actually, let's back up to the call transcripts that are just after that. I'm going to mark that on yours. Which exhibit are we on now? Probably on D.

You've got one job, Ron. Just kidding. I'll go ahead and fill this out a couple so I know where I'm at. I'll fill out the next one. So if you could put that sticker on that one page. Stick it right there.

(PLF. EXH. D, Call Transcripts, marked for identification.)

BY MR. CARLSON:

Q.   We've covered this a little bit, and I apologize for asking again. I don't want to ask you the same question, but I want to confirm that this -- do we know if this is the actual transcript of what she said or the transcript she was -- he

or

she was supposed to read from?

A.    It would probably be both.  I mean, this is what she said, but this is typically what our messages -- or when we leave voice mails are.

Q.    So when they -- this is kind of

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

50

hypertechnical, but how did -- who put this on this page?

A.    Heather.

Q.    Heather put it.  Where did she get the information from?

A.    The recordings of the call that I sent her from our CXM recording software.

Q.    Heather did.  Okay.  So she would be the one who would know if this was exactly what the recording said versus what they were supposed to read or -- and the reason -- I'll tell you, the reason I'm asking this is they have two dates on both of them, which struck me as odd, that somebody would -- even reading from a script would say the exact same thing.  That may be just a minor difference.  I'm assuming this was something they were supposed to read from, but at the same time it's on a page indicating the date the call was made.  So there's a little bit of confusion on my part.

But I -- what I'm gathering is if

99

Heather wrote this, then Heather would be the one to -- that would know how that document -- this document came about.

A.    Yes, sir.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

51

MR. CARLSON: Okay. So next is a letter -- next page is a letter, one of the three letters we think was sent. I'm going to put Exhibit E on that. Hopefully somebody can read it later.

(PLF. EXH. E, Collection Notices to Mr. Cross dated 11-8-16, 12-8-16, 1-9-17, and Fed Ex Duplicate Invoice to Mr. Cross dated 5-6-16, marked for identification.)

BY MR. CARLSON:

Q. And this was a letter that -- and I'm being specific. Synter did not send this letter out. Your mail servicer sent it out; correct?

A. Yes, sir.

Q. What on this letter is information that came from you that was specific to Asa Cross's file or account?

A. Customer name, the address, the 306 Emory Drive, the balance due, the original creditor, the customer's account number. And our file number is just our file number in FACS.

Q. Do you send these out to -- or do you

direct your letter servicer to send these out for every account?

A.    All third-party accounts, yes.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

52

Q.   Whether it's consumer or commercial.

A.   Yes.

Q.   So if you send this out to a commercial account, you're telling them they have 30 days -- you're providing what we call a 1692g notice even though that doesn't apply to them.  I can explain what that G notice is if you want, but it's that 30-day paragraph.

A.   Right.  Yes, we send the same letter out regardless of the status of the account.

Q.   You also have a note.  It says:  See reverse side for important information.  What is on the reverse side?  What was supposed to be on the reverse side?

A.   I'm not sure.  I'd have to find that out.

Q.   Presumably something was there, I guess.

A.   Yeah.  I mean, I can find out, yeah.

Q.   Okay.  Nothing's there now.

A.   Right.

Q.   We'll figure it out, though.  Who is

Fed Ex TechConnect?

A.    That's Fed Ex' corporate name.

Q.    So what's Fed Ex Freight?

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

53

A.    I guess they're a -- I don't -- I guess they're like a subsidiary of Fed Ex TechConnect. I mean, Fed Ex TechConnect is the corporate name that they go by, and Fed Ex Freight is just their freight division.

Q.    So who's your contract with?

A.    Fed Ex TechConnect.

MR. HAYS:  To be clear, you don't -- is that a guess?

THE WITNESS:  I'm not a hundred percent sure.  I'm sorry.

MR. CARLSON:  Okay.  I assume we're going to get a contract, so I wasn't too super worried about that.  I didn't --

THE WITNESS:  Right.

MR. HAYS:  Just -- I didn't want --

MR. CARLSON:  I'm -- that was more for my --

THE WITNESS:  Right.

MR. CARLSON:  -- concern, because I

don't really quite understand how Fed Ex works
either.  That's one of the issues we have in this
is dealing with them and the cluster they've made
of corporate structure.
BY MR. CARLSON:

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

54

Q.   Is there anything in this letter that would be -- indicate this is a commercial versus a consumer debt?

A.   No, sir.

Q.   I won't mark these, but this December 8th letter, the next letter appears to be the same?

A.   Yes, sir, it is.

Q.   With the date being different.

A.   Yes, sir.

Q.   Same thing for the next letter, January 9th?

A.   Yes, sir.

Q.   So you -- and all three of these you have a -- what I'm calling a G notice.  It's that 30-day language in there.

If someone on a commercial account basically took that as it was written and sent a validation request, what would you do?

A.   We would put the account on hold and provide them the information that they're requesting.

Q.   Where would you get that information

from?

A.    We would -- some of the information would be potentially the bill of lading and proof

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

55

of delivery that we get off of -- get from Fed Ex's system, and then we provide them with an invoice.

Q.    Do you have to go back and get that from Fed Ex, or do you already have it?

A.    We don't have -- we have their system, so we're able to reproduce the bill of lading and proof of delivery.

Q.    So everything -- well, everything that's in Fed Ex's system you can see.

A.    Not everything.  I mean, they don't give us access to everything.

Q.    What do they not give you access to that you know of?

A.    Like sales rep information.  I mean, I don't know of anything other -- anything other than that.

Q.    Okay.  When do you look at that information?

A.    We --

Q.    Go ahead.  I'm sorry.

A.    When do we -- what do you mean, when do

we look at it?

Q.   Well, when -- if somebody validates it, is that when you look at it, when they -- or they request a verification.  Then you go and you pull

56

the documents and...

A.    Yes.

Q.    Do you know when they pulled the documents on this account to review them?

A.    We never spoke to the customer, so we never pulled them to review them.

Q.    If you go, I guess -- what all, I guess, is in your EDI file?  Is that what you're referring to when you --

A.    The placement file?

Q.    Okay.

A.    Correct.  The customer name, their address, the balance that's due, the customer's account number.  It also has some of the bill detail or shipment detail where what was -- what product was shipped, what the dates were, who the shipper was, who the consignee was.  That's what is --

Q.    And is that sent to you hard copy, or is that --

A.    It's -- no -- EDI, where --

Q.    EDI.

A.    Yeah.  Electric -- electronic.

Q.    It's electronic, right, I'm guessing?

A.    Yeah, um-hum.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

57

Q.   Is that the file that you have access to from Fed Ex, or is it something they sort of send over with electrons as an email or something of that nature?

A.   It's -- we don't have -- I mean, our IT department gets the placement file, and we load it in our system.

Q.   So this is -- I'm getting some of the semantics here just to make sure I understand. There's a system that Fed Ex has.  There's a system that you have.  They're separate; right?

A.   Yes.

Q.   And you get this file from Fed Ex and it goes into your system.  Everything's electronic in that process.

A.   Yes, sir.

Q.   Is it done via email, or is it done as sort of a automatic thing, no human intervention required?  You just get a -- you just get a new account, like it's entered in the database automatically?

A.    Pretty much.  I mean, they send a placement file, EDI file, and then it gets into our system and then we load it.  I mean, it's not an email.  It's just EDI.  It's just a electronic

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

58

transmission.

Q.   I guess what I'm getting at -- and I think this is the case.  Okay.  Does Fed Ex have access to your FACS system?

A.   No.  I mean, they're able to if they want to, but they don't have access to it.

Q.   So they can't -- either the people there or their computers can't put stuff in your FACS system without some intervention from people here.

A.   Yes.

Q.   Okay.  So this EDI file that you get, how -- and you may not know, but how is that put in your system?  Does somebody at this company take the file and load it?

A.   I'm not a hundred percent sure if the...

Q.   Who would know?

A.   Someone from IT department would know for sure.  I mean, either someone -- they load it or the system's set up to where once we receive it it just loads automatically.  I'm not sure which

115

one it is.

    Q.   Well, how do you receive it?

    A.   EDI.  I'm not an IT person, so...


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

59

Q.  I mean, does it -- I'm -- you know, you can get emails with attachments.  And I'm a little bit dumb in this, too, so I'm just trying to understand.  You can get emails with attachments that are the database file, like a .db file.  And it could load that or you could -- the systems could have some protocol where they already talk and they just -- Fed Ex just sends it over and no human intervention is needed.  The file just shows up and the accounts just show up.  There has to be some way.  They could send it on a CD or a jump drive or something of that nature.  I don't think they're doing that, but I don't know.

A.  No, they're not doing that.

Q.  So there's nothing coming in the mail.

A.  No, sir.

Q.  Is there any -- is it coming via email?

A.  No, sir.

MR. CARLSON:  You're a computer guy.

How else could they send it?  If it requires some

kind of human intervention I guess is what I'm getting at.

MR. DANIELS:  I mean, it could be something like a old school, almost a telnet.

MR. CARLSON:  That's what I was

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

60

thinking, maybe, but...

MR. DANIELS:  That's the only thing I could think of.

BY MR. CARLSON:

Q.  Is there somebody we could -- at IT here that we could ask at some point?

A.  Yes, sir.

Q.  Okay.  Is that file, the EDI file printable?

A.  I'm not sure.

Q.  Okay.  Do you know -- what you've given us in this -- the last document stack I gave you -- it's not really marked as an exhibit -- how much of that comes in the EDI file?

A.  Which stack are you talking about?

Q.  Basically it starts where it says duplicate invoice.

A.  Okay.

Q.  And you've got a couple of bill of ladings there and then you've got --

A.  Right.

Q.  You get down to delivery receipt.

119

Those five pages or so.

A.    Um-hum.  I mean, they give us some of the -- they give us the shipper name, consignee

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

61

name, what was -- what the product was, how much the weight was, where it was shipped from, where it was shipped to.

Q.   So they've given you -- is it a spreadsheet of information or is it documents like this?

A.   It comes through the EDI file and then it gets loaded in our system.  So the --

Q.   So -- okay.  Is the EDI file like a comma-separated value file?  And CSV stands for comma-separated value.

A.   Right.  I'm not sure.

Q.   Okay.

A.   I mean, I know what you're talking about, but I'm not sure if that's what -- how it comes.

Q.   Do you know if you get PDF documents in that EDI file?

A.   We don't.

Q.   Do you know where these documents came from, the ones -- the Fed Ex duplicate invoice?

121

A.    Probably off their system.

Q.    Off their system.

A.    Yes, sir.

Q.    Okay.  Do you know which -- what file

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

62

that Dominique -- what file Dominique reviewed or what documents she reviewed prior to starting the collection process?

A.    She would have reviewed a window in our system that has the bill detail.

Q.    Okay.  Can we get a print-off of that window?

A.    Yes, sir.

Q.    Does that bill detail, does that -- is there any other thing in the EDI file that's not in that window?

A.    I'm not sure.

Q.    The IT guy would know --

A.    Yes, sir.

Q.    -- probably?

A.    Yes, sir.

Q.    So this Fed Ex duplicate invoice, this comes from Fed Ex's system.  Let me rephrase that.

You access Fed Ex's system and there's this document in there; is that right?

123

A.   Yes, sir.

Q.   Do you know what the rate -- if you look at the document there's a -- it says used test equipment there.  On pieces, 1, says one piece of used test equipment.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

124

63

A.    Um-hum.

Q.    And it says the rate is a hundred -- well, it says 148.090.  Do you know what that rate means?

A.    No.

Q.    Do you know what the class 077 means?

A.    I think it just has something to do with what -- what Fed Ex deems that product is classed to be.  That's all Fed Ex information.

Q.    Okay.  So no -- well, would anybody else here know either of those two questions?

A.    I don't know.  I mean, I would say -- I don't know if they would or not.  I would say --

Q.    I don't know is not a bad answer sometimes.

A.    Yeah.  I don't know.

Q.    I don't want you to guess.

A.    Right.  I don't know.

MR. CARLSON:  The next page looks like a bill of lading, and I'd like to mark this as an exhibit.  I think I'm on G now?

MR. DANIELS:  I think you're on E, I

thought.

THE WITNESS:  I think you're on F.  No, wait.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

64

MR. DANIELS:  I remember D.

MR. CARLSON:  I wrote a D and I'm doing

H.

MR. DANIELS:  You did that one.

MR. CARLSON:  Yeah, I did.  Here we go.

(PLF. EXH. F, Uniform Straight Bill of

Lading Original, Not Negotiable, dated 5-6-16, Copy

of Mr. Cross's Driver's License, and Fed Ex

Delivery Receipt dated 5-6-16, marked for

identification.)

BY MR. CARLSON:

Q.    Is this document something that is in

Fed Ex's system as well?

A.    Yes, sir.

Q.    To get this document you can get it

anytime you want, though, I presume.

A.    Yes, sir.

Q.    When did you get these -- this document

and the one before it?

A.    Whenever Heather requested it for this.

Q.   Are we able to know when Heather requested it?

A.   Not without asking her.

Q.   Okay.

MR. HAYS:  Can I have a second?

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

65

MR. CARLSON:   Sure.

BY MR. CARLSON:

Q.   If you keep that one out and if you go two pages over there is a -- what appears to be a picture of a driver's license.  Does that come from the same Fed Ex system?

A.   Yes, sir.

Q.   Okay.  And why was -- why were these documents -- I don't think I asked this.  Why were these documents pulled?

A.   I'm not sure why she pulled these.

Q.   It does require some initiative.  It's not an automatic dump.  Someone actually has to go from Synter to the Fed Ex system and --

A.   Correct.

Q.   -- pull the documents.

A.   Yes.

Q.   Okay.  If you go back to Exhibit F there's a shipper certification.  Can you tell me, as best as you can, what name that is there?

A.  Shipper certification?  I don't know what -- can you tell me --

Q.  I'm sorry.  Yeah.  It was obvious to me, but no one else can see what I'm looking at.

A.  I mean, it looks just like a --

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

66

somebody's signature.

Q.   Can you make out what letters might be in there?

A.   No.

Q.   Does it look anything like Asa Cross?

A.   I'm not -- I can't tell.

Q.   If I said I was Asa Cross and signed that signature, would you accept that as my signature?

A.   Can you ask that again?

Q.   If I sign -- if I said I was Asa Cross or if Asa Cross was sitting here and Asa Cross signed it with that signature, would you accept that as his signature?

A.   No.

Q.   If you'll skip two pages over back to that driver's license again, there's a signature on that driver's license if you can see it.  It's under what looks like his picture.

A.   Right.

Q.   As faded as it is, does that signature

131

look anything like the signature on Exhibit F?

A.   I can't make it out.

Q.   Would you -- does that signature look like an Asa Cross signature on the driver's

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

67

license?

A.    I can't make out if it is or not.

Q.    Are these the -- are these documents exactly what you get from Fed Ex?

A.    If we request them, yes, sir.

Q.    This is as clear as they get.

A.    Yeah, this -- I mean, that's what we get, yes.

Q.    Is there a back page to any of these?

A.    You'd have to ask Fed Ex.  I don't think so, but this is their documentation.

Q.    When you pull these documents, how do you -- how does that process work?  So I'll rephrase that a little bit.

Somebody has to go into Fed Ex's system.  I assume they have some type of log-in.  And they see a document they want.  Well, do they have an option?  Can they pick documents, or does it just do a document dump for everything in the file?

A.    You can pick and choose documents.

Q.    And how do you determine which documents to pick and choose?

A.  Usually we always send the invoice, and

then we'll either send the proof of delivery or the

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

134

68

bill of lading.

Q.    And what's your criteria for doing that, for requesting those documents?

A.    If it's -- if we're speaking with the shipper, we would send the bill of lading if they wanted a copy because they were the ones that would have initiated the bill of lading.  And if we're speaking to the consignee, we would send them the proof of delivery.

Q.    How long does it take you to pull this, to pull those documents from Fed Ex's?

A.    I mean, just a few minutes once you get in their system and pull up the pro number.

Q.    More or less than 60 seconds?

A.    More.

Q.    Okay.  More than 10 minutes, less than 10 minutes?

A.    Less than 10 minutes.

Q.    You don't do this on every file, though; right?

A.    No, sir.

Q.   And we don't know when it occurred on this file.

A.   We didn't request it on this file.

Q.   Then how did we get them?


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

69

A.   Heather pulled them for this deposition.

Q.   So when Heather -- when you pull these documents, does the account notes normally reflect that?

A.   No, the account notes wouldn't reflect it if Heather requested them.

Q.   If someone else requested them would the account notes reflect it?

A.   Yes.

Q.   Do you normally put everything in your account notes?  Well, when a file's normally being processed by a -- your personnel, do they put everything in the account notes?

A.   Yes, sir.

Q.   So if it's not in the account notes, it didn't happen.

A.   Yes, sir.

Q.   How many accounts do -- how many accounts do you normally manage at one time?

A.   I don't know the number.

Q.   Is it more than 10,000?

A.   For the -- for Synter as a company?

Q.   Yeah.

A.   Yes.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

70

Q.   More than a hundred thousand?

A.   I'm not sure if it's that high.

Q.   How many per collector do you -- on average do you manage?

A.   It varies just based on the portfolio they're working.

Q.   Do they have more than a hundred per collector?

A.   Yes.

Q.   More than a thousand?

A.   No.

Q.   More than 500?

A.   Some -- not -- again, it just varies. Some do, some don't.

Q.   So 500's probably about average then.

A.   Could be.

Q.   Okay.  That would be a reasonable -- you would not be surprised if somebody had 500 accounts they were managing.

A.   Depending on what project they were working, I wouldn't be surprised.

Q.   Okay.  How often do they, I'll call it, touch a file or do you expect them to touch a

139

file?

I can explain what that means if you want, but...

A.    Sure.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

71

Q.   How often are they supposed to go in and do something with that account?

A.   Again, it varies based on the portfolio.  We have different MSLs that the collectors follow, and a lot of it's based on the outcome of the call.

Q.   What's an MSL?

A.   Minimum service levels.  It's just something that we use here like a SOP or SoW.

SOP.

Q.   Where are those documented at?

A.   Just -- they're -- I mean, each team lead has -- I don't know.  They have their SOPS that they give out to their collectors.

Q.   Are those based on the client?

A.   Sometimes.  Sometimes they're just based on us, just how we want to collect certain accounts.  Some clients have us work it a certain way, SoW, but most of it's just a guide for our collectors to work around.

Q.   Is there one of those for Fed Ex accounts?

A.   Yes.

Q.   Can we get a copy of that?

141

A.    Yes, sir.

MR. CARLSON:  Let's see.  I'm going to

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

72

jump to your FDCPA training material.  We'll mark that Exhibit G, I believe.

MR. HAYS:  Yep.

(PLF. EXH. G, FDCPA Training Course and FDCPA Qualification Quiz, marked for identification.)

BY MR. CARLSON:

Q.  How often do your employees go through FDCPA training?

A.  They do during their orientation when they first start at Synter, and we usually do refreshers every 90 days.

Q.  How long does the training last?

A.  I would say maybe an hour.

Q.  Is it like a group, one-on-one or something of that nature?

A.  Right now our HR manager, during the orientation of new hires, does it with however many people are starting on that particular day, and then the refreshers are done with each respective team.

Q.  So who -- does somebody lead it or is

it computer based or -- beyond the initial one.

A.    Not the initial one?

Q.    Well, both.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

73

A.   Both.  The HR manager leads it, speaks about it.  They talk about it, go over it.  And then the refreshers are done by the team leads.

Q.   Okay.  And this is the material they go through?

A.   Yes, sir.

Q.   So you would agree -- I'm on -- again, it's not Bates stamped, but there was the initial outline page, and then there is a page that talks about -- well, one of the first headings is what types of debts are covered.  Then there's the next page which says what does the debt collector have to tell me about the debt.  And if you get sort of about a third of the way down it says what practices are off-limits for debt collectors.  Talking about false statements.  According to your material, misrepresenting the amount you owe is a false statement that is off-limits.  Would you agree with that?

A.   I'm trying to find it.  You said it's

under the false statements?

Q.   Yes, sir.  It's one of the bullet points.  It's one, two, three, four down under false statements.

A.   Um-hum.  And what was your question?

74

Q.    That misrepresenting the amount you owe is a false statement, and that practice is off-limits for debt collectors.

A.    Correct.

Q.    The next page is kind of a subset from that heading still.  It says -- skip the first two bullets, but then it says debt collectors may not give false credit information.

MR. CARLSON:  Well, strike that.

BY MR. CARLSON:

Q.    You didn't -- did we not -- we didn't report this.  Is that what we decided?  This was not reported to anything?

A.    No, sir.

MR. CARLSON:  Okay.  Disregard that.  It doesn't add any value then.  That was not what the -- some of the other discovery responses said, so that's why we went down that road.  My apologies.  So --

MR. HAYS:  If I misled you down that road I apologize for doing that in the first place.

147

MR. CARLSON:  That's okay.

BY MR. CARLSON:

Q.   You've got an FDCPA quiz here.  Do you give this quiz to everybody?

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

75

A.    Everybody that starts at Synter, yes, sir.

Q.    Do they have to do it again at the refresher training?

A.    No, sir.

Q.    What's the -- is there a pass/fail requirement or...

A.    No, sir.

Q.    They just have to take it?

A.    They take it and then just go over -- the ones they miss, we go over it with them.

Q.    Okay.  I'm going to jump to No. 10 on the quiz.  Maybe it's been a while since you've taken it, but do you know the answer to No. 10?  The question is:  A debt collector can leave the following information on a voice mail.  And then there's several options, none of which have a letter, but I assume it's like an A, B, C, D.

A.    Right.

MR. HAYS:  And to clarify, you're asking him personally if he knows the answer.

MR. CARLSON:  Sure, we'll start with that, yeah.

149

THE WITNESS:  Let's see.

BY MR. CARLSON:

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

76

Q. I tell you what. You can refer to any of the material you've given me, too, which I think I've given back.

A. Yeah.

Q. Because really, I'm actually more concerned what Synter's policy is, not so much whether you know, I guess --

A. Right.

Q. -- since you're not calling people.

A. Right.

Q. But --

A. Every once in a while. If it -- for a commercial account we would answer C, the third one.

Q. But that's not what the question says; right? It says -- it doesn't distinguish between commercial or consumer.

A. Right.

Q. So what would be the --

A. So in that case it would be none of the above.

Q.   None of the above.

A.   Yeah.

Q.   Okay.  How about No. 11?  The following is commonly called the mini Miranda pursuant to 15

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

77

USC 1692e(11).

A.    The first answer.

Q.    And going on to No. 12, the question is:  A debt collector needs to say the mini Miranda every time they talk to a consumer.  True or false?

A.    True.

MR. CARLSON:  The next page is FDCPA guidelines.  We'll mark that Exhibit H.

(PLF. EXH. H, FDCPA Guidelines, marked for identification.)

BY MR. CARLSON:

Q.    Thank you, sir.

A.    Yep.

Q.    These are guidelines for Synter; correct?

A.    Yes, sir.

Q.    Okay.  For what it's worth, I'll submit to you this is what was provided to us in our -- as part of the package that was provided --

A.    Yes.

Q.    -- from the request for production.

153

So

these are the guidelines that you follow all the time.

A.    Yes, sir.

Q.    Who decides what the guidelines are

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

78

that you have to follow?

A.   I mean, me and one of the other owners or business partners came up with these guidelines.

Q.   Okay.  Without -- if you -- assuming you have a compliance attorney, don't tell me what you told them or what they talked about.  But do you have a compliance -- FDCPA compliance counselor or some kind of consultant that you use or was this just sort of on your own research or something else?

A.   Just done on our own.

Q.   Okay.  So in the first paragraph of the exhibit you've got -- basically the fourth line down it says the FDCPA was put into effect to protect consumers, which are individuals as opposed to companies; right?

A.   Yes, sir.

Q.   So the FDCPA doesn't apply to companies.

A.   Correct.

Q.   It does apply to individuals, though.

A.   Yes.

Q.   Below that paragraph you have a section

that says:  This information covers any account by

which the debtor is an individual versus a company.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

79

And your example is Henry Smith versus Henry Smith, Inc.

A.    Correct.

Q.    Do you have any procedures that apply to corporate accounts or business -- nonconsumer accounts?  We'll use that word.

A.    Do we have any policies?

Q.    This policy appears to me to apply only to consumer accounts.

A.    Um-hum.

Q.    Do you agree with that based on -- not the whole thing, but this section here, it says: This information covers any account by which the debtor is an individual versus a company.

A.    Um-hum.

Q.    Is there another section somewhere where it says this information covers any account by which the debtor is a company versus an individual or something similar to that language?

A.    I don't know if we have something that formal for -- like that for commercial accounts.

Q.    You're going to get us the EDI file; right?  We're going to get that, a printout of it?

A.    I don't -- we can have you talk to our -- I don't know if there's a printout of the EDI

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

80

file.

MR. CARLSON:  Okay.

MR. HAYS:  What we can do --

MR. CARLSON:  We'll find out if there is one.

MR. HAYS:  Off.

MR. CARLSON:  Okay.

MR. HAYS:  We'll go off.

(Off-the-record conference.)

MR. CARLSON:  We can go back on.

BY MR. CARLSON:

Q.  Do you know if the EDI file lists Asa Cross, Inc. or Asa Cross, LLC?

A.  I don't know.

Q.  Is there any indication on anything we've seen so far today that he was listed as a company versus an individual?

A.  Say -- ask that question again.  I'm sorry.

Q.  Is there anything that we've seen that I've provided you today, which I believe is the extent of what we got in the request for production -- you're more than welcome to look at

159

it again.  I think there was one more page to this.

You can look at any of that.  That would indicate

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

81

that Mr. Cross was a company versus a consumer? Or an individual I think is the term you used in the guidelines.

A.    I mean, there was -- ask it one more time.  I'm sorry.

Q.    Is there anywhere in the documents we've looked at today --

A.    Um-hum.

Q.    -- where you've seen -- or even any documents you've seen anywhere that you can recall where it said Asa Cross, LLC or Asa Cross, Inc. or anything other than Asa Cross?

A.    No.

Q.    Okay.  So based on your FDCPA guidelines, he's an individual, not a company.

A.    We thought -- or we think it is -- it was a commercial account coming in.

Q.    Because of -- not because of the name but because of something on the bill of lading?

A.    We had no reason to believe it was a consumer account.

Q.    Okay.  Did you -- I don't want to

161

talk about what your attorney told you or anything, but

did you see the interrogatory requests we sent across?  By that I mean we sent to your attorney

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

82

and I presume he talked to you about.

A.   Yeah, I know I've reviewed everything that he sent me.

Q.   Okay.  I don't think I gave you copy, did I?  I did not do this.  I'm going to say it several times just to make sure I don't mess up and ask you something and you say something that's privileged.  I certainly don't want to -- I don't want you to tell me anything he -- any communication.

A.   Yes, sir.

Q.   If that makes sense.  But there are a few things I will ask.  This is the -- we'll call this Plaintiff's Exhibit I.

(PLF. EXH. I, Defendant's Responses to Plaintiff's First Interrogatories dated 3-28-18, marked for identification.)

BY MR. CARLSON:

Q.   This is the -- this is your responses.  By you I mean Synter's responses to interrogatory requests that we sent.  And what that means is -- I'm sure your attorney probably explained it.  We

just asked a bunch of essay type questions and we want answers for them.  It helps gather all the discovery and it makes the 30(b)(6) more

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

83

interesting and other depositions more interesting.

Have you seen -- and these are the responses as well as the questions. So this is not what we sent. This is actually what you responded with, but it incorporates what we sent.

A. Yes.

Q. Assuming it was typed up correctly, which I'm -- I won't hold you to the questions. If they're typed wrong, then they're wrong. But the answers are more important, I think. Have you seen these before; do you recall?

A. Yes, sir.

Q. Did you -- I don't think we ever got a verification for these. So if you're okay with it, if you want to go through and look at them, I just -- on the record, if you want to verify these are correct, I'm okay with that, I think. I don't need a formal...

A. Okay.

Q. Is it -- do you recall all of that?

A.   Um-hum.

Q.   You're asserting that those are all correct in your answers?

A.   (Witness moves head up and down.)

Q.   And by your I mean Synter's.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

84

A.    Yes, sir.

MR. CARLSON:  Okay.  Do you want to take a break for a minute and look over those other documents?

MR. DANIELS:  Yeah, we can.

MR. CARLSON:  Okay.  This is a good time.  Yeah, I think I'd like to go off the record and just take maybe a 10- or 15-minute break so I can look at what we've got so I don't just ramble through them.  I'm still going to ramble through them --

MR. HAYS:  Sure.

MR. CARLSON:  -- and be incoherent, but --

MR. DANIELS:  Try to be as efficient as possible.  If y'all want to go look --

MR. HAYS:  Yeah, we can look at some of this other stuff.  I'll take the list.

THE WITNESS:  Okay.

(A recess transpired from 10:42 until 11:16.)

MR. CARLSON:  Back on the record now.

BY MR. CARLSON:

Q.  So I'm going to hand you now what you've just handed me as the back page of Exhibit

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

85

E. So I'll give you that. If you want to put that with the exhibit. And so this is -- now Exhibit E, going back to the front page, which I've got in my notes, but I know what it says, I think, that is a letter that Synter sent to Mr. Cross.

A. Yes, sir.

Q. You guys directed that to be sent.

A. Yes, sir.

Q. And, as far as you know, was sent.

A. Yes, sir.

Q. Did you get a return mail or did you get anything indicating it was not sent or it was returned?

A. No, sir.

Q. Would you get something like that?

A. Yes, sir.

Q. Does the -- if a -- your letter provider, if they send a letter out and it is returned, does it come to you or does it go to them?

A. It goes to this address on top of the

letter, the top left side.

Q.    Okay.  The Virginia?

A.    Ashland, Virginia.

Q.    Okay.  And I presume that is not you,

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

86

that is the letter servicer address?

A.   Correct.

Q.   And how do they let you know that the letter was not delivered or there was some problem?

A.   I'm not sure.  I know we put the information when we receive it in our system that it was a bad address and we blank the address out in our system, but I'm not sure how they -- I'm not sure how that gets to us.

Q.   Who would know?

A.   I imagine probably someone in our IT department that deals with the letter company would know what the actual process is, procedure.

Q.   If we go to that second page that we just talked about which will now be part of the exhibit.

MR. HAYS:  Um-hum.

MR. CARLSON:  If you're okay with that.

MR. HAYS:  Sure.

BY MR. CARLSON:

Q.   Actually, let's go back to the first

171

page again.  I'm sorry.  We talked a little bit about this, what I call the G notice.  That's that 30-day dispute language that comes straight from the statute.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

87

A.    Um-hum.

Q.    Basically what it requires -- I'll read the second sentence.  If you notify this office in writing within the 30-day period that this debt, or any portion thereof, is disputed, this office will obtain verification.  Then it continues on.  The next sentence says:  Upon your written request within the 30-day period, this office will provide you name and address, and it continues on.

That 30-day period they're referring to is really in reference to the first sentence which is after receipt of the notice; right?

A.    Yes.

Q.    So the consumer has 30 days from getting this notice to do a written dispute.

A.    Correct.

Q.    Okay.  What do you do when -- well, how often do you get a written dispute?

A.    I don't know.

Q.    Do you ever get written disputes?

A.    Yes, sir.

Q.    Okay.  What do you do if you get an oral dispute?

A.    We typically tell them that they still need to send us something in writing.


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

174

88

Q.   Okay.

A.   But depending on what the dispute is, we may go back to Fed Ex to see if it's a valid dispute.

Q.   Do you have any SOP, any kind of procedures or any process you go through to make that a repeatable decision, or is it just whatever the collector decides that day?

A.   Well, it's whatever the customer tells us is the dispute.  I mean, is there any -- I mean, if a customer calls in and they say they're disputing the bill we'll ask them why and they give us the reason.  And we may be able to tell them why that's not a valid dispute, but if we're not sure we ask them for some documentation.

It could be a rate dispute or a discount dispute.  They didn't get their proper discount.  In some cases we'll ask them to provide their tariff, you know.  And that's where Fed Ex signed up with that particular customer as far as

the tariff or contract on -- with that particular company.  And if we get that information and it seems like it could be valid, then we stop calling and we send it back to Fed Ex for them to review and wait for an answer.


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

89

Q.    What are you required to do if they do an oral request versus a written request?  What do require your collectors to do?

A.    We just document the dispute in our account notes.

Q.    Do you have to -- I think you already answered this, but is it a valid request if it's orally, or does it have to be in writing?

A.    If it's oral we can still continue to call, depending on the situation.

Q.    Okay.  So if we go to Page 2 that we just added to it, there's some little language from the FTC about treating consumers fairly and notifying them of the following rights.

The second paragraph, presumably one of the following rights, it says:

Consumers may request orally or in writing details regarding any debt being collected.

Where did that language come from?

A.    I'm not sure.

Q.    And if it came from your attorney,

177

then I guess don't tell me.  I'm not sure if that would be privileged or not.  But they need to request in writing, don't they?

A.   Yes.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

90

MR. CARLSON:  Okay.  Let's see.  I apologize.  This is going to be a little bit painful.  These account notes are always -- it's like learning another language every time.

MR. HAYS:  So you're going to look at the screen?

MR. CARLSON:  Yeah, we can do the screen too.  Which one -- let's do the screen first.  That should be quicker.

MR. HAYS:  Okay.

MR. CARLSON:  I shouldn't have said that.  I'll mark that Exhibit J if you have your screen.

(PLF. EXH. J, Collect Screen, marked for identification.)

BY MR. CARLSON:

Q.  I probably covered up a -- I think it's just a bar.  That's okay.  So this will be Exhibit J.  And you're saying this is the screen that the collector, one of your employees who collects then has access to make the decision on -- well, to do all her debt collection work, his debt collection

179

work.

A.   Yes, sir.

Q.   I know I just butchered the

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

91

description.  If you want to change it, that's fine.

A.   It's all good.

Q.   So there's an account number on here. There's -- it says collect screen 8, 1, 1 at the top.  What does that mean?

A.   That's just our FACS system, like -- that's how we get to a collect screen, like 8, 1, 1, and we can pull up a customer's account.

Q.   Okay. Like hot keys, sort of.  Not hot keys, but -- so it's like a old kind of DOS sort of screen.

A.   Yeah, yeah.

Q.   Okay.  What does JJC stand for?

A.   John Joseph Church.  Me.

Q.   That's you.

A.   My initials.

Q.   Okay.  So you just pulled this then. Is that what that means?

A.   I just made a copy of it --

Q.   Okay.

A.   -- because you asked for it.

Q.    What does pound PTS mean?

A.    I'm not sure.

Q.    There's a slash 65.  Does that mean

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

92

anything to you?

A.   No, sir.   I mean, no, it doesn't.

Q.   Okay.   What is PU date?

A.   Pickup date.

Q.   What does that mean to you?

A.   It means when the delivery was picked up, this particular shipment.

Q.   Picked up by who?

A.   By Fed Ex.

Q.   So what does -- I'm assuming below that is delivery date.

A.   Correct.

Q.   Below that I'm assuming stands for invoice date, the INVC?

A.   Yes, sir.

Q.   I'm a little incoherent.   I'm just going to go down the whole column first.   SHPR is shipper, probably?

A.   Yes, sir.

Q.   And that is -- according to this, is Asa Cross.

A.   Yes, sir.

Q.   Not Asa Cross, Inc.?

183

A.    I don't know if it is or not.

Q.    But on the page it doesn't say Asa

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

93

Cross, Inc.

A.    No, sir.

Q.    Or Asa Cross, LLC.  There's no designation for that name that it's a company.

A.    I've seen companies like that.  I've seen companies that are -- I've seen customers that have -- that are companies with names like that.

Q.    Sure.  But this screen, there's no -- I'm not asking you, I guess --

A.    Okay.

Q.    -- at this point if Asa Cross is a company.

A.    Okay.

Q.    I'm asking, looking at that, is there anything -- is there an Inc. or an LLC after his name?

A.    No.

Q.    Okay.  These are pretty obvious.  I'm going to skip some of them.

What does PO stand for?  It's about eight or nine down, I think, on the first column.

A.    I would think that's like a PO number.

Q.  But just so we're clear, you're not really sure?  That's what you think it is?  And that's fine.  I just don't want you to --

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

94

A.    Yeah.  I'm not sure.

Q.    I don't want you to --

A.    Right.

Q.    Okay.  What's BOL stand for?

A.    Bill of lading.

Q.    What's supposed to be in there?

A.    I'm not sure.  Nothing in particular.

Q.    It's blank now; correct?

A.    Yes.

Q.    Is it always blank?

A.    I don't know.

Q.    Who would know?

A.    I don't know if anybody would know.  I mean, we can't -- I don't know -- I don't know, without just looking at a number of accounts, would we be able to see if it's blank all the time or not blank.

Q.    Is there a -- I can't remember if I asked this or not before.  Is there a book or a manual for this system that would tell us?

MR. HAYS:  Let's go off the record.

(Off-the-record conference.)

187

MR. HAYS:  We can go back.

BY MR. CARLSON:

Q.   Okay.  It's probably a freight

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

95

description.

A.    Yes, sir.

Q.    Probably would change that in the letter code, but that's me.

A.    It's an old system.

Q.    Yes.  FRT description.  And that just says used test equipment?

A.    Yes, sir.

Q.    And there's an FRT rate.  So I assume that's freight rate?

A.    Um-hum.

Q.    That was on the other screen we saw. Seeing it here, does that change -- I think you said you didn't really know what that was.

A.    I mean, I --

Q.    Does that change?

A.    I think it's the --

Q.    If you don't know, it's okay.

A.    Yeah.

Q.    I mean, that's fine.  I don't know what it is either.  That's why I'm asking.  FRT WGT?

A.    That's the freight weight.

Q.    That's 600.  Do you know what units

189

that's in?

    A.    Pounds.


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

96

Q.   How do you know that?

A.   Been doing it for 24 years.

Q.   Have you ever shipped anything?

A.   Yes, sir.

Q.   Have you seen what you've shipped come back on this screen?

A.   I've not ever -- I've shipped stuff personally.

Q.   Right.

A.   Not on Synter's behalf.

Q.   So what I'm getting at is:  Have you ever correlated something you've shipped to something coming in on this screen under that variable?  Let me ask it a different way.  That's a terrible question.

Have you seen anything that's listed here that's come in from Fed Ex that's got a FRT WGT value and have you ever actually weighed that item?

A.   No, sir.

Q.   So my guess is that -- you've been doing it for a long time.  Obviously you're very

good at it, I'm sure.  Very -- I'm not saying
that's not a reasonable assumption that it's
pounds, but my question is, I think it's still an

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

97

assumption.  May be a very good one, but...

A.   On this particular screen, yes.

Q.   Okay.  What's terminal mean?

A.   I don't know.  We have -- I'm not sure.  I mean, terminal -- this is just a billing field that we use, and some customers give us that information and some don't.

Q.   Okay.

A.   I can assume what it is, but I don't want to assume.

Q.   That's okay.  It's going to come with the handbook.  That's fine.  I mean, I'm -- if you don't know that --

A.   Right.

Q.   -- I don't know is a perfectly good answer.  What's DOCS REQ?

A.   I'm not sure.

Q.   How about -- do you know what it stands for?  I can think of a couple of things.  That's why I'm not sure.

A.   I think it could be docs requested.

Q.   Okay.  How about WI WGT N inspect?

193

A.   So like a weight.  Weigh in, weight inspection.  That would be something where if -- if that window was filled -- if that field was

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

98

populated, when something gets shipped, the shipper

gives them what they say the weight is and they get

a quote.  And then every once in a while you see

the -- you know, the drivers on the interstate that

have to stop and get stuff weighed.

Q.   Um-hum.

A.   So if it was -- if there was a weight,

an inspection document for us to pull off Fed Ex's

system, it would populate there.

Q.   Okay.  This one's blank, for whatever

that's worth, I guess; right?

A.   Um-hum.

Q.   Okay.  How about CLT COLL code?

A.   I don't know exactly what that is.

Q.   Aging info load?  I skipped one, which

is somewhat obvious, I hope.

A.   That's -- that would be for just a

different portfolio, like just -- like what the age

of the invoice is when it came in like just for our

own.

Q.   How about PMT TTL?

A.   I'm not sure.

Q.   Okay.  I think that's probably bad credit flag, but it's bad CRDT FLG.

A.   I would think that's correct.


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

99

Q.   When would that be -- when would there be something there?

A.   I don't think there's ever anything there.  I think it's just a field that's in our FACS system.

Q.   Is that -- okay.  You don't pull credit reports at all?

A.   No, sir.

Q.   Do you do any kind of -- any kind of -- I call it skip tracing, but any kind of research on people you're collecting from?

A.   Yes, sir.

Q.   You do?

A.   Um-hum.

Q.   What kind of research do you do?

A.   We'll look at the customer's website, look at some of the documents to see if we can find a phone number.  We'll do a Google search for the business name.  We may -- mainly primarily Google search.  Sometimes we'll do a secretary of state search, try to find out who the owner may be.

197

Q.   Do you use any -- I call it proprietary, but any sort of paid subscription checks or just Googling?

A.   We send our accounts that come in with

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

100

no phone numbers to a company that just scrubs for phone numbers.

Q. Okay. If you'd done any of those things with Asa, that would be on the -- we won't initially go into it now, but it would be on the account notes; correct?

A. No, sir. It would be in a -- we call it window 106, which I could get -- I could print a copy of that for you. That's just a skip trace window.

Q. Okay. Yeah, on a break.

A. If the account came in with a phone number, you know, that window would probably not have anything in it because we got a good working number.

Q. Oh. So that's just -- that window is just for the ones that don't have phone numbers.

A. Correct.

Q. What about just in general, any -- I'm going to call it skip tracing, but you're not quite doing that, I guess. Any checking you do, would

199

that be on the account notes or would that be on

another window for the -- I'll give you an example.

A.    On window 106 it would show if -- how they found a number, whether it was a Google

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

101

search, a secretary of state search, like that.

Q.    So in the case of like Asa where you had a phone number, presumably you got the phone number when the account came in, I guess; right?

A.    I think so, yeah.

Q.    So was there any -- on his account was there any checking done to determine anything about him aside from looking at the account notes and looking at what you got from Fed Ex?

A.    I don't think so, but I'd have to look in window 106 to make sure.

Q.    Okay.

A.    But I can easily -- I can make a copy, easily get that for you.

Q.    Okay.  But that's the window that will have all of your skip tracing activity in it?

A.    Um-hum.  Yep.

Q.    So I'm going to jump back up to the next column.  Payment terms.  Well, I'm assuming something.  Does PMT stand for payment?

A.    Yes, sir.

201

Q.    What does 15 mean there?

A.    That means that the customer's payment terms are net 15.  So they're past due after 15 days.  That's with Fed Ex.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

102

Q.   So Fed Ex determines that.

A.   Yes.

Q.   And you -- okay.  You can't change it.

A.   No, sir.

Q.   Can you change anything on this screen?

A.   No, sir.

Q.   On your other screen where you use skip tracing, can you change anything there or is it just adding?

A.   You can change.

Q.   Okay.  You can change.

A.   (Witness moves head up and down.)

Q.   You just can't change on the 811 screen.

A.   On this particular window which is called our bill window.  I mean, I went to 811 and pulled up the account and I typed in bill and this window came up.

Q.   Okay.

A.   Which is like our freight bill description window.

Q.   I'm going to assume that says payment method.  It's PMT.  What does the P stand for there?

A.   Without looking at the documentation,

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

103

proof of delivery, I would -- I don't want to assume. I'm not sure.

Q.    Okay. CLNT ID. I assume that's client ID?

A.    Yeah. That must be something internal to Fed Ex. It's not anything to do with us. This is all Fed Ex information that they send to us.

Q.    So they send the information, but the fields are set by your system; correct?

A.    Correct.

Q.    So I'm just trying to understand how it works, I guess, but I'll think more about that. I'm just trying to figure out how they're filling this stuff out. Is this a system that Fed Ex said you have to use?

A.    No. This is our system. FACS is a Synter system.

Q.    Is it universal in the industry for this type of -- these type of accounts?

A.    Other companies like ours use FACS also.

Q. Okay. So that kind of makes sense. So is that pretty much industry standard for freight accounts, if I'm using the right term, or is there other ones out there?

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

104

A.   I'm sure there's other systems that other companies use I'm not privy to.

Q.   Does Fed Ex -- are you the sole debt collector for Fed Ex?

A.   No, sir.

Q.   Do you know how many other collectors they use?

A.   Just depending on the portfolio, I mean, I know about two more that they use that we compete against.

Q.   Do you know -- this is -- I'm not sure it's relevant.  Do you know if they use FACS as well, those two companies?

A.   I'm not sure.

Q.   Okay.  Can you customize these fields as a company, I mean?

A.   Yes, the fields we can on the -- on the -- yes, the stuff on the left side and the --

Q.   You could add fields to it.

A.   We could.

Q.   And then -- okay.  Does Fed Ex tell you which fields they're going to send you?

A.    Pretty much.  I mean, we would like to get this -- we tell them what fields we'd like.  And if it's in their EDI file when they FTP it to

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

208

105

us, then it comes into that screen.

Q.    Okay.  So you -- you said or FTP.

A.    Yeah.

Q.    Is that how they're sending it?

A.    Well, we found that out on our break.

Q.    Okay.

A.    I mean, it's EDI, but it's -- EDI is electronic digital -- I forgot the last part of the acronym.  But it's FTP, so it's not done by email or anything like that.

Q.    Right.  So if someone -- do you -- where's the -- this may be the wrong question for you.  But do you know where the FTC -- FTP server is, who has the FTP server?

A.    I don't.

Q.    That may be outside of what -- so the way the FTP works is you've got a client and a server.  Presumably, either you or Fed Ex is the server and one of you is the client.  I guess both of you could be clients, I suppose, but I may be asking the wrong person.  I'm sorry.

A.    You are.

Q.   Yeah.  That's okay.  Yeah, I'll save that for the IT person if we ever -- I'm just curious.  Yeah.  All these ones that are blank, is

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

106

the book, the file you're going to send me going to tell me those values, what they mean?

A.   I'm not sure.

Q.   Okay.

MR. HAYS:  Presumably.

THE WITNESS:  Yeah.

BY MR. CARLSON:

Q.   Well, does the book come from -- is it a book from FACS or is it your own book?

A.   It's from FACS.

Q.   Okay.  But some of these fields are customizable?

A.   Yes, sir.

Q.   Are any of these fields stuff you've added that FACS did not have?

A.   It could.  I mean, it could be, yes.

Q.   Okay.  I'm assuming those would be ones the book probably doesn't tell me about.

Okay.  And this is the -- I think I asked this, but this is Dominique's?  This is the screen she looked at?  Or at least the equivalent of the field hasn't changed?

A.   Correct.

Q.   And this is what she determined made it a commercial account.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

107

A.    Yes.

Q.    And that was based on just the fact that it's used test equipment.

A.    Yes.

MR. CARLSON:  Mark this Exhibit K.

(PLF. EXH. K, Account Notes dated 11-8-16 through 2-5-17, marked for identification.)

BY MR. CARLSON:

Q.    This appears to be the account notes that were -- I guess they were printed today, but...

A.    I think that was -- I got them from Heather.  The account notes, that was part of what -- I printed it today for you, yeah.

Q.    Okay.  I'm assuming, like most systems, you can't -- you can add to this, but you can't change anything.

A.    Correct.

Q.    Once it's in there, it's in there?

A.    Yes, sir.

Q.    I apologize.  I know this is going to be painful.  We're just going to start at the top.

So what does NJE stand for?

A.    It stands for night job.  I think execution is what the E stands for.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

108

Q.   Okay.  What does that mean?

A.   It just means that a night job is requesting the letter -- requesting the letter to go out.  LR stands for letter request.

Q.   Okay.  There's a date.  Looks like November 8th, 2016.  And that is 4:07?

A.   Yes, sir.

Q.   I don't see a P after it and I see a

P

later.  So would that be an AM --

A.   Yes, sir.

Q.   -- probably?

A.   Yes, sir.

Q.   So you have employees working at 4 in the morning?

A.   Our letter company does the -- the night job is not a person.  It's just a --

Q.   Oh, okay.

A.   I'm not sure.  It's a process.

Q.   So the first thing on here is the letter.

A.   Correct.

Q.   And so NJE comes from the letter servicer or --

215

A.   I mean, it just -- it's just a process in our system where it's been -- we've requested

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

109

the letter.  We've requested the letter to be sent

out and that's just the notation that shows that we

requested it and then from there it goes to the

letter company.

Q.   Okay.  I think I'm tracking.  So when

you get a file, there's some automatic fancy

software stuff that sends it to the letter

servicer.  And then it -- whatever it does, the

software does that, puts this entry in there, this

NJE when it's sending the package -- I'm going to

call it the package -- the letter company

requesting that the letter 1401 go out.

A.   Yes.

Q.   Okay.  And the index, I'm assuming --

let me back up.  So you've got -- we've kind of

covered this, but LR number 1401 --

A.   Um-hum.

Q.   -- references -- I'm going to call it a

template.  It's a letter that you've given them

previously that's got fields, and they populate the

fields based on the file you give them.

217

A.   Yes, sir.

Q.   And ET.  What does that ET stand for, if you know?

A.   I'm not sure.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

110

Q. But it says ET LTR1401. And as a whole time you think that is indicating that's the first that particular -- that's a 1401 letter has gone out; right?

A. Yes.

Q. Okay. Does it save that letter somewhere?

A. I can look at the letter here and see if it does.

Q. I mean, I guess it does because we've got a copy.

A. I don't know that it would. I mean, that 1401 is more just for our internal purposes. That's our initial dunning letter that we send out on all accounts. So I don't think it would.

Q. Okay. And if there's a 2 or 3 after that, it just means it's the second or third time that letter has gone out?

A. Yes.

Q. That equivalent letter template has gone out.

A. Yes.

Q.    Where -- so when a letter goes out, is

it -- is a scanned image saved or is it just...

A.    I mean, we can -- we're able to pull

111

the letters that are sent -- that are mailed out, like an image of it.

Q. Okay. So it does scan?

A. I don't know how. I'm not sure if it scans or not, but we can go to our letter service and request a file number and then it will show. That's -- I'm sure that's how we got these letters.

Q. Okay.

A. I know that's how we got these letters.

Q. Are you sure they weren't recreated based on the template and the data that was in the template?

A. I'm not sure.

Q. Okay. But you didn't have a copy until you requested it from them, from the letter servicer.

A. Correct.

Q. And that's not -- unless somebody requests it like in this case, that's probably not a standard practice.

A. Correct.

221

Q.    Okay.  Do you have any idea what the index number is?

A.    No, sir.

Q.    Does that come from Synter or does that

112

come from your letter servicer?

A.    I'm not sure.

Q.    Who would know?

A.    Our IT person.

Q.    Okay.  Now just to make sure I'm tracking, so the NJE, that is from your system, not the letter servicer.

A.    Correct.

Q.    That's just -- okay.  Just showing communication with them.  I've seen some other systems where it goes back and it goes both ways and nobody knows who's sending what.

But why is that row highlighted or appears to be highlighted?

A.    I'm not sure.  That's just the way it printed out, I guess.  I'm not sure if the font was different on the computer screen or not.

Q.    So that wouldn't mean anything to you, looking at it?

A.    No, sir.

Q.    The next line says NJE 11-08-16 at 9:01.  It's got LS number 1401.  What does that

mean?

A.    Letter was sent.  LS stands for letter sent.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

113

Q. Okay, okay. So the LR is letter requested, LS is letter sent.

Does that line come from Synter or does that line come from the letter servicer?

A. I think -- I'm not sure.

Q. Okay. Who would know that?

A. The IT person.

Q. Let's go to the third line. It's November 11, 2016 at 6:55 P. Presumably PM. There's a GCN. What does that GCN mean?

A. I think that's Global Connect.

Q. That's the auto dialer?

A. Yes.

Q. Okay. Called -- I'm reading the rest of it now. Sorry.

A. Um-hum.

Q. Called 110826 -- okay. That's the date. I'm sorry. Looks like November 8, 2016. Is that your assertion?

A. Um-hum.

Q. So called on November 8, 2016 at 9:27:00 AM and it called 478-338-0472, but then it

says call canceled.  So if I'm reading this, is that's -- the Global Connect called that number at 9:27 AM, but the call was canceled.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

114

A.    Right.

Q.    What does that --

A.    Never actually went through.

Q.    Okay.  What do you mean by didn't go through?

A.    Just the call was canceled.  I mean, it was -- the account was set up to go on the dialer and it was just -- it just canceled.  That particular call canceled or those four particular calls canceled.

Q.    And it's -- how do you --

A.    We didn't call them on the dialer.

Q.    Okay.  Well, I guess I'm confused about canceled.  So how do you cancel a call?

A.    It would have been something -- I'm not sure how that -- I'm not sure.  You'd have to ask the IT person.

Q.    Okay.  The next line down, I'm going to skip the time and date.  Same date.  Actually, the same time.  What's 3021 stand for?

A.    That's just a disposition that we use

internally like a status code.  3021 is -- for our -- for Synter's purposes it's a new account that we don't have a contact, that we haven't actually spoke to the customer.

115

Q.   Is there a list of those codes?

A.   I can -- yes.

Q.   Okay.  Is that something we can get?

A.   Sure.

Q.   What does UAM complete mean?

A.   I'm not sure.

Q.   IT person probably know?

A.   Yes, sir.

Q.   Okay.  The other thing, too, if there's a book that explains all this, that's fine as well.

I don't know if you've got a manual of some sort that would...

A.   I don't know if we have the Global Connect manual or not.

Q.   So all of these are Global Connect sort of automated entries, kind of?  Or at least -- this is not something you've entered.  No employee's actually typed in UAM complete --

A.   Correct.

Q.   -- that we know.

A.   Right.

229

Q.    Hunt and pecking.

A.    Right.

Q.    It's not a field or an automatic entry

you set up to automatically enter.  It's something

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

230

116

that Global Connect would have?

A.    Or our system does the night job.

Q.    Okay.  We might be able to get that.

A.    I'm sure we have a manual form, but, I mean, I'm sure you can get one from them too.

Q.    Let's see.  So the end of that line is some -- frankly, looks like gibberish.  ENDI MIGN.  Does that mean anything to you?

A.    No, sir.

Q.    Okay.  It looks like that same -- sort of the same entry occurs about three times, four times.

A.    Um-hum.

Q.    So we'll skip all of that.  So DNS. What does DNS mean?

A.    That's the collector's initials.

Q.    Okay.  That was Dominique?

A.    Dominique, yes, sir.

Q.    Okay.  So December 5th, 5:01 PM she called 478-338-0472, and she presumably types -- typed this information in there?

231

A.    Yes, sir.

Q.    Looks like it says reached voice mail?

A.    Yep.

Q.    I'll let you tell me what the rest of

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

117

that means.

A.   Okay.  That's fine.  It's reached voice

mail, left voice mail, advised call back to discuss

past due invoices.

Q.   Okay.  What's that next -- so that was

two lines together.  What's the third line there?

A.   That's where she kept it in 3400, which

is one of those status or disposition codes.

That's -- we call it a call back.  And so then from

there she would have pushed the account ahead

however many days she wanted to push it ahead based

on the MSLs.

Q.   Okay.  That would tell her when to go

back and do something else?

A.   Yes.

Q.   Okay.  What's the AM stand for?

A.   That 34 -- 3400 disposition is like --

call back AM is like Eastern time.  You know, we've

got 3404, which is -- it says PM, which is more

233

like Central or West Coast times, so --

Q.   Okay.

A.   Yeah.  So we know to call those accounts Eastern Standard Time and not --

Q.   Makes sense.  You don't call them at 3 o'clock in the morning.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

118

A.    Right.  Yeah.

Q.    You won't do that too many times.  So the next two lines also appear to be highlighted. I'm going to see if they're pretty much the same. It looks like they're just a repeat of that 1401 letter?

A.    Right.  Every 30 days for Fed Ex.  If we haven't made contact with the customer, we're required to send out the 1401 letter.

Q.    Okay.  Looks like pretty much the same. All right.  There's a JJC line that's right before the final highlighted section.

A.    Um-hum.

Q.    What does JJC stand for?

A.    That would have been me.  At times we unassign accounts and we set up new routes.  We have new collectors that come in.  And it was just a matter of -- I just unassigned the route, so it goes to what we call collector zero.  It went from Dominique, and then it goes into -- we just call it collector zero, and then it just routes -- it

235

just

moves the accounts into predetermined routes.  So I

just unassigned this account, but then it assigned

back with RAS, Rebecca Sieg.

Q.   And after you -- looks like after you

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

119

unassigned it or reassigned it, maybe, it sent the

letter out again?

A.   Right.  Not because it was unassigned.

Q.   Right.  That's an automated -- looks like that's automated.  It just happens.

A.   Every 30 days if we don't speak to the customer.

Q.   Okay.  So that requires -- if the account's in your system, it sends a letter out, if

it's meeting the 30-day requirement, per Fed Ex.

A.   Right, if we haven't spoke to the customer.

Q.   If you haven't spoken to them.

A.   Right.

Q.   Okay.  So I'll just let you explain. The line after that, the first RAS line.

A.   Um-hum.

Q.   You can skip the date and the time. That's pretty clear.  But there's a T and then -- I

guess that's her abbreviation for telephone number.

237

Okay.  That makes sense.

A.  Yeah.

Q.  Basically, I think that's saying the same thing that DNS line did.  It looks like rescheduled.  Is that what that means?  Or I guess

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

120

you tell me, after the phone number, what those codes mean.

A.    I mean, it's tried -- tried phone number.  Reached voice mail.  Window 2 is where -- is just where we -- where we see where the phone number is.  Reached voice mail.  Left Zortman, which is a message that we would -- I mean, some of our collectors just leave that message regardless.  They just leave that message.

Q.    Does that refer to the -- I don't have the language, but the second voice mail that was left, basically?  That's your --

A.    Yes, sir.

Q.    That code for that --

A.    Yes, sir.

Q.    -- that script, I guess.

A.    Yes.

Q.    Okay.  Why do y'all call it a Zortman?

A.    It's just some name affiliated.  I'm not sure.

Q.    Okay.  All right.  What does it mean

239

phone when you say debtor -- or Rebecca said debtor flag changed from blank to G?

A.    If -- in this particular -- she must have -- I mean, Dominique didn't do it, but our

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

121

collectors, when they determine that the account number is good, they'll just put a G by it.  You know, in this particular case that was the only phone number we had, but just that it's a good number, good working number.

Q.  Okay.  So if you get a -- when the answer is -- if you get a voice mail that says this is who you thought it was, that's a good number versus maybe nobody answering, no message.

A.  Correct.

Q.  It looks like the same.  Same, same. So it looks like on February 17th there was an automated action at 3:12 AM where the account was closed.

A.  February 5th.

Q.  I'm sorry.

A.  Yeah.

Q.  I mean, whatever I said, ignore that. It's February 5th, 2017.

A.  Um-hum.

Q.  The account was automatically closed. So you've only got -- I guess you've only got so many days to --

A.    Right.    For this particular portfolio we have 90 days to collect.


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

122

Q.   Okay.

A.   And after that the account will just close out of our system.

Q.   You have to collect everything within 90 days, or do you just have to start getting activity where they're paying something?

A.   If we have something in what we call a promise to pay, then we can keep it past the 90 days.

Q.   Okay.  What is that last line after the time, 3:12?  Do you know what any of that means?  ET 9, something, something, 000007, probably.  A lot of zeros in there, but it starts with 9.

A.   I mean, I know the 9 -- part of that is 9,000, which -- I mean, the account -- that's the disposition it goes into when it's closed, but the IT person would know exactly what that means.

Q.   Okay.  Where would be the entries when they review -- review the accounts or do any review of -- well, let's say a verification was requested.

243

Where would it -- where would it show that? Would

it be on this screen or would it be on a different

screen?

A.    What do you mean by verification?

Q.    So you call up -- for example, if

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

123

someone -- I guess it could be orally or written. But if you call somebody and actually get them on the phone and they say, you know, it's not my debt, verify it or some other language of that nature, where would that be documented?

A.   It would be -- one of the collectors would put the account in one of those status codes, 3310, and that stands for request documents.  And from there they would go to window 205 and they would put the customer's email address, what documents they want sent and enter out of that window.  And then our support team would actually request -- I mean, get -- make -- I guess execute the request.  They would actually pull the documents and email or fax, whatever the debtor's preferred method of communication is to receive it.

Q.   So it would be basically a one-line entry here telling you all that, but then there would some other screens that --

A.   Right.  When the support person's done, they go back on the -- the support person would go

back in the notes and put the account in 3201 which is documents sent.  So it lets the collector know that the documents have been sent.

Q.    So would the same thing occur if

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

124

somebody did a written dispute?

A.    Yes.  I mean, if it was a written dispute it would be notated on the account, and then the request -- then it would be -- it would be put in the notes.  Then we would put in 3310 and go to window 205 and put how they want it sent, whether it's fax or email, and put the email address in there and what documents they actually want sent.

Q.    Okay.  How often do your debt collectors look at -- well, so we have the screen.  This is the screen they look at, I guess, when they're initially trying to call them?

A.    Yes, sir.

Q.    So when they're going to call, say, Asa Cross, this screen would be up.  Let me ask you: Is there one screen or two going?

A.    There's -- there's one main screen and then there's windows.  Like that's -- that right there is a window, like a billings window.

Q.    Okay.  So I guess when you're -- this

may depend on the person collecting.  But is there -- they got this where they're -- when they're doing their normal collection they can see this screen.  What I'm showing you is the

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

125

collection screen that -- I forgot what exhibit we

marked it as.

A.   Yeah.

Q.   But it's probably --

A.   J.

Q.   -- J.  So they're looking at J.  Can they see anything else other than J when they're doing their collection?

A.   I mean, they can look at the -- we call it main screen, window 2, I mean, which has the customer information, address and phone number. And it's got like just the -- it just has the service date, which is the shipment date, and our list date, which is when it got listed with Synter.  So that's what -- how they start.

And then they would typically go from that screen and look at -- if they actually speak to the customer and they have them on the phone they're going to go and refer to that window so they can speak intelligently about the shipment.

Q.   Okay.  Which -- this is J again.  Which screen did you call this?

249

A.    Bill screen.  B-I-L-L, all caps.

Q.    So there's the bill screen.  And they look at -- well, they have a screen 2 they look at

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

126

first, is what you're saying.

A.   Right.  Yes, sir.

Q.   Okay.  And screen 2 just has their phone number and address?

A.   And it's got some of the account -- it has the account notes.  That's where they put their account notes in there too.

Q.   So it has the --

A.   Right.

Q.   -- at least some of what's on Exhibit K?

A.   Yep.

Q.   Okay.

A.   I can print that, that window out also if you'd like.

Q.   Actually, if you wouldn't mind, I would like to see --

A.   Okay.

MR. CARLSON:  We can take a break and do that real quick if you want to.

MR. HAYS:  Okay.  Which one are you

251

talking about?

MR. CARLSON:  This is screen 2.

THE WITNESS:  Window 2.  And then you also wanted to look at --

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

127

MR. HAYS:  Window 106.

THE WITNESS:  -- skip trace window 106.

MR. CARLSON:  Sure.  That would be great.

THE WITNESS:  I'm going to do it for this particular account, of course.

MR. CARLSON:  Oh, yeah.  I don't want anything else.  Thank you.  That would create problems I don't need.  Off the record.

(A recess transpired from 12:02 until 12:15.)

MR. CARLSON:  So back on the record.

BY MR. CARLSON:

Q.    So we got what you're calling screen 2; right?

A.    Yes.

Q.    Thank you, sir.

A.    Um-hum.

Q.    All these codes.  Is there a book that's got all these codes so I don't have to ask them all?  Is that going to come in the book, we think?

A.    Depending on which code.  I mean, yeah.

I mean, it will come in the book.  You know, some of the fields we use different than some other

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

128

people who use FACS use it for.

Q.   Okay.  So this is the screen that comes up initially when a collector is going to do something on the account.

A.   Yes, sir.

Q.   This is -- we're calling this screen 2?

A.   Yeah, that's what we call it.  Window 2.

MR. CARLSON:  We're going to call that Exhibit L.

MR. HAYS:  Exhibit L is window 2.

(PLF. EXH. L, Collect Screen, Window 2, marked for identification.)

MR. CARLSON:  There we go.  I probably covered something up there, but hopefully it's not too important.

MR. HAYS:  No.

BY MR. CARLSON:

Q.   So I'm kind of pontificating on how I think the system works, probably somewhat like my

255

system, is that you get a message to work that account, certain automated -- either because you just got a new account or you said go forward 10 days or 30 days.  Something pops up and says you've got to do something with this account.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

129

A.   I mean, not exactly, but --

Q.   Okay.  Well, tell me.

A.   I mean, our -- I mean, the status codes, like it comes -- the accounts come in 3021 and that the -- you just go into a certain disposition or status code in our system and you go to that and then it just pulls up the oldest wait -- it pulls up the oldest wait date account in that disposition.  So it's not like a -- it doesn't just pop up.  You have to hit enter in order to get to the first account for you to --

Q.   Okay.  I think I'm -- so you get a list, and whatever's on top is kind of like the one that needs the most attention?

A.   It's not in a list form, but it's just -- the system just pulls the accounts up for them to work by oldest wait date.

Q.   Okay.

A.   I mean, the --

Q.   I think I'm tracking.  Okay.  So -- but

this is --

A.    They just go into a certain -- like they go into 3400 or 3100 and they say, hey, here's promise to pays.  They go into disposition 3100, which is promise to pay disposition, and they hit

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

130

enter a couple times and then this account comes up

that they need to work.

Q. Okay. So how would this one come up on

the initial -- the first time ever that the debt

collector or your employee sees it? How would that

sort of play out?

A. I mean, they would, I mean, see it

whenever Dominique worked it in 3400.

Q. Okay. So it --

A. It's in their route, but they're not --

they don't -- she didn't actually do anything until

December 5th.

Q. Okay. So December 5th she goes in, she

looks in -- I'm not going to hold you to this being

exactly. This is more of an understanding for me.

She's going to go into 3400 query.

A. Um-hum.

Q. And it's going to pull up -- this would

be one of the accounts it pulls up.

A.   Yes, sir.

Q.   Okay.  And it won't do it -- why did it take almost a month for that to occur?  Is that just an automated -- it takes that many days before she really needs to look at it?

A.   Right.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

131

Q.   Okay.  How long would it go -- how often do they normally do those queries?

A.   I mean, every day.

Q.   Okay.  So this doesn't sit somewhere waiting for like two weeks to be worked?  I mean, if there's something to be done.  It may sit for two weeks because it's told -- been told to sit for two weeks.

A.   Right.

Q.   Okay.  And so the first screen she looks at that's got any information is this screen.

A.   Correct.

Q.   And from this screen she calls a number?

A.   Right.  She would call the number and then she would pull up that bill image window, the other screen --

Q.   Okay.

A.   -- as she's calling.  This window gives her some information but not much.

Q.   Okay.  So as she's calling, she pulls

up the other screen and it gives her the other stuff.

A.    She'll pull the other screen up should she talk -- should the customer answer and we

132

actually speak to them.

Q.   Okay.

A.   There's no --

Q.   That way when the customer asks something you can answer it reasonably and just --

okay.

A.   Right.  And even if they -- if they don't answer the call there's no need to look at the window, so we just leave a message and go on.

Q.   Okay.  So screen 2 is where you do most of your work then, I guess.  That pops up, you call the number.

A.   Um-hum.

Q.   And you probably look at your notes screen, which is --

A.   Which is at the bottom, I mean.

Q.   Be at the bottom of this?

A.   Yeah.

Q.   Okay.

A.   Which -- yeah.  If you could take Exhibit K and put it at the bottom, it would be underneath there.

Q.   Okay.  I'm going to ask a few questions on the bottom of this.  I think the rest I can either figure out or just guess.  I'm going to

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

133

start where it says MHA.  It's under principal.

A.    Yes, sir.

Q.    Actually, let's back up.  Principal due is zero.  Why is principal due zero?

A.    We just are dealing with a past due amount.

Q.    Okay.

A.    Which is what we were -- what Fed Ex sent us to collect on this bill.

Q.    Okay.  I'll back up some more.  I'm sorry.  So I'm just going to kind of run through this for myself a little bit.  We've got the account number, we've got our window screen.  It says account closed.  I'm guessing -- this was printed today, so the account's closed today.

A.    Yes, sir.

Q.    That's kind of a column there.  So I'm going to have to figure that out, but -- so it's saying Fed Ex Freight.  So that's the client number, CLT.

A.    That's our -- that's our client.  219 is the client number we have associated with Fed Ex

Freight.  That's our own internal number.  That's how we distinguish that we're working a Fed Ex Freight account.  That's the customer's Fed Ex

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

134

Freight.  Direct is the -- that's just the portfolio that we call it.

Q.   Um-hum.

A.   They're out of Harrison, Arkansas.

Q.   Don't want to go there for a deposition.  No offense if anybody's from Arkansas.

So you've got a list date.  And I guess that was the date you guys got it, probably?

A.   Yes, sir.  That's the date it was listed at Synter.

Q.   Service date is the --

A.   Date of the shipment.

Q.   Okay.  LTRS is letters, maybe?

A.   Right.  Yes, sir.

Q.   So that tells you there's been three letters sent out?

A.   Correct.

Q.   So I guess -- okay.  So they can look and see right away if there's 150 letters, you know, 151 is probably a waste of 15 cents or whatever.  Or is there some benefit to them looking at letters?

A.   Not really.  That's just --

Q.   A summary?

A.   Just a summary.


A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

135

Q. What does time 240 mean?

A. The time that was spent on the -- the time that was spent on this account, 240 minutes. It could be -- we -- if one of our collectors is working the account, it clocks time. If they get up to go to break or lunch and they stay on the account, it's going to just track time.

Q. Okay.

A. So it's just minutes.

Q. But -- okay. So it's minutes, but it's not really relevant to much of anything other than --

A. We use it internally, yeah. We use it for just reasons -- or Synter does.

Q. Okay.

A. Just like a -- how much time --

Q. If it's an automated -- like the letter is automated.

A. Yeah.

Q. If somebody leaves it open and it runs --

A. It's going to -- right.

269

Q.   Yeah.

A.   I mean, there's -- we wouldn't spend normally 240 minutes on this.  I mean, that's not a

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

136

good number.

Q.   Wouldn't make a lot of number on this one.

A.   No.  Right.

Q.   Then you got calls 8.

A.   Right.  That would be --

Q.   The total number of calls or a summary of the calls, I guess?

A.   Yep.

Q.   Okay.

A.   And then contacts zero.  And that's -- if we speak to the customer we would, you know, put that on that particular call and it would go to contacts, one.  If we spoke to them another time we'd put one contact.  Then the next time you looked at that screen it would be two.

Q.   Okay.  What's the worked four?  Is that -- I can guess, but I'll let you tell me.  I don't want to...

A.   Worked.  I don't know.  I've not -- I don't know that it -- I couldn't tell you.

Q.   Okay.  I've got a theory, but it

doesn't matter.

A.    It doesn't help us collect the account.

Q.    Yeah.  So I'm going to skip down a

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

137

little bit to where it says MHA and it's got a date.

A.    Yes, sir.

Q.    And that is --

A.    That's Mack Altman.

THE REPORTER:  I'm sorry.  You're talking over each other.

THE WITNESS:  I'm sorry.

BY MR. CARLSON:

Q.    Go ahead.

A.    Do you want to know who MHA is?

Q.    If you just want to kind of tell me what that whole line means --

A.    Sure.

Q.    -- that's where I'm going to end up next?

A.    That's fine.  I'm sorry.

Q.    No.  You're fine.

A.    MHA is one of our IT people, Mack Altman.  I mean, obviously the date, the time. This was one of those occurrences where we had to -- we wanted to recreate the letter for this purpose.  So it actually shows that he actually

went in and recreated the letter so we could get it

from the image so we could provide these letters

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

138

for you.  And then he just closed the account.  I mean, that's what that is.

Q.   What is that line?  So there's a 12:13 entry, which is what you just read, and then there's a 12:14 entry.  It's got some -- it looks like -- I can guess what that is, but I think that's really in relation to the line before that. But do you know what any of that means on that next line, 12:14?

A.   LD number 1401?

Q.   Yes.

A.   No, sir.

Q.   The 12:15 line or 12:15 PM you canceled the account.  What does that mean?

A.   Just -- when we put in the account 9000, it -- that means that it's -- we're canceling the account.  And then night job puts it into what we call 9999, which is accounts closed in our system.

Q.   Why was it canceled in December of 2017

versus --

A.    It was --

Q.    -- sometime prior when it was --

A.    Because we had to recreate the letter.

In order to recreate the letter we had to open up

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

139

the account again so the balance would show up on the account.  We did originally -- you're right.  We -- it was closed prior by the system.  So in order for us to recreate the actual letter, we got to open the account so it has a balance.  And then he recreated -- gets the letter, recreated, prints it out and then we've got to make sure we close the account back because we're not supposed to have it open.

MR. CARLSON:  I'm tracking.  Okay.  So this will be M, M as in Mike.

(PLF. EXH. M, MSL Guidelines for FXF/FNL, Client 200219, marked for identification.)

BY MR. CARLSON:

Q.    And you've got copies of these already.  I just put this --

A.    Yes, sir.

Q.    -- on that one, so I'll just give you that one.  Okay.  Thank you.

A.   Um-hum.  Oh, you've got another one too.

Q.   I have extras.  It's okay.  And this is your guidelines that -- this is Exhibit M again. Mike for M.  The calling guidelines provided by the Fed Ex entities.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

278

140

A.   It's for -- it's Synter's guidelines for working Fed Ex's business.

Q.   Okay.  Is this something you've -- is this something you've worked in coordination with Fed Ex, or is it something Synter's done on their own?

A.   Synter's done on their own.

Q.   Okay.  So you could -- okay.  So I'm going to go down to sort of at the bottom of the page here.  It says:  Fed Ex has a strict no complaint policy.  What exactly does that mean?

A.   They just don't like to get complaints from companies like ours.  They want to keep shipping with their customers and they don't want to lose customers.  So they have a no complaint policy.  They don't want to get a call from a customer complaining about how we spoke to them or handled their account.

Q.   It seems kind of hard to manage if you're -- I mean, that's a tough -- somewhat unfair for them to send the account to collection and get

mad when somebody gets mad because they sent the account, but...

A.   That's Fed Ex.

Q.   Yeah.  I think -- I guess you've got to

141

deal with it there.

A.    Yeah.

Q.    So this is an escalation process. I'm -- tell me what you mean by escalation process.

A.    I mean, just saying be, you know, mindful of your demeanor on all calls.  Our rule of thumb is, you know, we don't leave any more than two messages left for the same person/party if the collectors receive no response.  So if there's -- no more than two unanswered messages.

So if we call and we get a voice mail, there's -- we leave a message -- we leave a message and don't get a call back for accounts payable or freight payable, then we would go to the controller.

And then this is a guideline.  This doesn't happen on every call.  But then if after that, if the controller doesn't call us back two times after we've left messages, then we escalate to the chief financial officer.

Q.    When would you call more than twice?

A.   Just as you're working the account. You may call it today and then push it ahead, depending on the balance.  Push it ahead for a week and call it in a week, and, you know, that's the

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

142

second message.  Then you have it set up for another week.  And then when you're getting ready to call the third time, you can -- you'll be able to tell that no one got a call back because there's no notes that we spoke to anybody.  And then you would call the number and try to escalate above the accounts payable office.

Q.  Did you talk to any -- did you talk to Asa Cross's controller?

A.  We didn't speak to anybody.

Q.  Did you call anybody different?

A.  No, sir.

Q.  I thought you called four times.  Well, maybe eight, but at least four.

A.  Right.  Over the course of three months of having the account.

Q.  But your policy is only to call twice to the same person.

A.  I mean, it depends.  You know, if the company's just -- the company could just be a single-person owner.  It could just be -- the

283

company could just have a cell phone and there's no one else you can call.  You can try to hit zero and it's not going to go anywhere else.

Q.   Did you get a phone tree when you

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

143

called Asa Cross?

A.    Get a what?

Q.    A phone tree like where you have, you know, press 1, press 2.

A.    I'm not sure.

Q.    But you called the same number every time; right?

A.    Yes, sir.

Q.    I guess I'm just confused at why it says here you're only going to call the same person twice, but you called the same person four times in this situation.  The same number, at least.

A.    Um-hum.

Q.    And you're sure that was his number. And by you I mean Synter, not necessarily you personally.

A.    Um-hum.

Q.    But there's no doubt in Synter's mind that was his number?

A.    Correct.

Q.    Do you have any contract that Asa Cross has signed?  Did Fed Ex provide that at all?

A.   I think that would -- I mean, you would have to check.  I would think the bill of lading is the contract, but you would have to check with Fed

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

144

Ex.  I'm not sure what they -- how they do that part.

Q.   But they haven't sent you -- Synter Resource has no contract Asa Cross has signed, as far as you know.

A.   Correct.

Q.   All right.  Are you familiar with a case Williams v. Synter Resource Group?

A.   No, sir, not off the top of my head.

Q.   It was a case -- how long have you been with -- well, you're an owner, I guess.  How long have you been an owner of Synter Resource?

A.   16 years.  Or almost 16 years.  I'm sorry.

Q.   Okay.

A.   In August.

Q.   I think you probably did tell me that now.

A.   Right.

Q.   2012, from what I can tell, you were sued in Colorado by Wade A. Williams?

A.   Okay.  I don't -- I mean --

Q.   Okay.  If you don't know, that's

fine.

A.  I'm not -- I don't recall.  I mean, I didn't --

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

145

Q.    Okay.  Who would know?

A.    Heather.

Q.    Okay.  2013 there was a suit from Arie

Corcos.  I'm not sure I'm saying that right, but it

was in South Carolina.  Does that ring a bell?

A.    No, sir.

THE REPORTER:  Could you spell that, please.

MR. CARLSON:  It's A-R-I-E, is the first name.  The last name is C-O-R-C-O-S.

THE REPORTER:  Thank you.

BY MR. CARLSON:

Q.    Heather would know that one as well?

A.    Yes, sir.

Q.    All right.  In 2016 there was a suit by

Phillip A. -- and I'm going to spell the last name -- K-U-S-N-E-T-Z.  Does that sound familiar?

A.    No, sir.

Q.    Heather would know.

A.    Yes, sir.

Q.    Another case in 2016 was Orzel, O-R-Z-E-L, versus Synter Resource Group.  Does

289

that

ring a bell?

A.    No, sir.

Q.    Another 2016 case, Silverman versus

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

146

Synter?

A.   I don't recall that.

Q.   Do you recall any litigation your company's been involved in in the past?  Other than those, I mean.

A.   No.

Q.   Heather would know.  Okay.  Actually, I've got one more thing, I think.

MR. CARLSON:  We can go off the record.

(Off-the-record conference.)

MR. CARLSON:  We're back on the record now.

(PLF. EXH. N, Online Comments, marked for identification.)

BY MR. CARLSON:

Q.   This is going to be Exhibit N, and I'll submit this is something actually Mr. Daniels pulled off.  The website is at the bottom that we pulled this off of.

And this is basically some comments, somebody calling about a debt collector, and I

think they somehow got around to a discussion about

Synter or maybe a phone number from Synter.

And I'm going to skip to Page 6 of 8 at

the top of that.  And I'll let you read that.  This

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

147

first section allegedly is a former employee of your organization, and just let me know when you're done reading it.  I wasn't going to ask you about any other thing other than that section.  You can read all of it if you want, but --

A.  Okay.

Q.  So it's worth what it's worth, you know.  So do you have any idea who this former employee might be?

A.  No, sir.

Q.  But is that a pretty accurate description of -- at least the first sentence, of what Synter Resource does?  The first sentence. I'm not going beyond that yet.

A.  Yes, sir.

Q.  Okay.  He states here most of the debts are because the party that is using these transportation companies fill out the bill of lading -- I think that's spelled incorrectly, but -- incorrectly, causing billing errors.

How often do you see -- how many times have you seen the bill of lading filled out

incorrectly?

A.    I couldn't tell you.

Q.    More than 10?

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

148

A.    Yes.

Q.    More than a hundred?

A.    Over what period of time?

Q.    One year.

A.    Yes.

MR. CARLSON:  Okay.  I think I've had enough fun.  One thing I'm going to -- normally we'd pass the witness, but we do have some things I think we need to cover with -- it's Heather?

MR. HAYS:  Yeah.

MR. CARLSON:  So I'd like to suspend the deposition to talk to her, maybe.  I'm not opposed to you if you want to do some follow-up.  I know it's a little out of order.

MR. HAYS:  Yeah.  But if we want to talk about -- if you want to -- you'd like Heather to address this stuff?

MR. CARLSON:  Um-hum.

MR. HAYS:  We may be able to do it either like by phone or get it and verify it.

MR. CARLSON:  She's in Vegas; right?  Or Nevada; right?  I'm going to Nevada.

295

MR. HAYS:  I'm not.

MR. CARLSON:  You can call in.  I'll get a video set up.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

149

MR. HAYS:  Well, point being that --

MR. CARLSON:  We could drive together.

I'm not driving.

MR. HAYS:  If we have three or four questions for Heather that, you know, we can get you answers for.

MR. CARLSON:  Yeah, we'll work with that.  I mean, if it's not something -- we don't need to go there.

MR. HAYS:  No, I understand.  I understand you're not -- the deposition is not concluded.  It's suspended pending the final question of somebody else who may be a 30(b)(6) on that topic.

MR. CARLSON:  Sure.  But I'm not opposed if you want to do follow-up.  Some people don't want to do follow-up if we're suspending it, but I'm not opposed if you want to do follow-up questions now versus later.

MR. HAYS:  No.  Actually, I'm not going to.

MR. CARLSON:  Okay.  Well, if you change your mind, I'm more than happy to.

MR. HAYS:  Sure.

MR. CARLSON:  Well, we can come back.

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

150

I mean, it's not that big of a drive.  So we're going to suspend it now.

MR. HAYS:  Okay.

MR. CARLSON:  And that's it.

MR. HAYS:  Okay.

MR. CARLSON:  Thank you very much for your time.  I appreciate it.

THE WITNESS:  All right.  Thank you. Appreciate it.

(The witness, after having been advised of his right to read and sign this transcript, does not waive that right.)

(The deposition was adjourned at 12:40 PM.)

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

151

                    SIGNATURE OF DEPONENT

DEPONENT:          JOHN J. CHURCH
DEPOSITION DATE:   May 11, 2018
REPORTER:          Sandra K. Bjerke
AWR JOB NO.        18112
CASE CAPTION:      Cross vs. Synter


(Please return both Signature of Deponent pages.)

        I, the undersigned, JOHN J. CHURCH, do hereby
certify that I have read the foregoing deposition
and find it to be a true and accurate transcription
of my testimony, with the following corrections, if

any:

PAGE    LINE           CHANGE    REASON

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

152

SIGNATURE OF DEPONENT (CONTINUED)

DEPOSITION DATE:  May 11, 2018
REPORTER:         Sandra K. Bjerke
AWR JOB NO.       18112
CASE CAPTION:     Cross vs. Synter


PAGE    LINE          CHANGE           REASON

_____

JOHN J. CHURCH              Date

I, Sandra K. Bjerke, Notary Public for the State of South Carolina at Large, do hereby certify that the deponent was advised of his or her right to read and sign said deposition both verbally and in writing.  If the deponent fails to execute and return foregoing Signature of Deponent page within the thirty (30) days allowed pursuant to the Rules of Civil Procedure, the original transcript may be filed with the court.

_____
Sandra K. Bjerke, RMR, RDR, CRR
My Commission Expires
June 18, 2020

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

153

CERTIFICATE OF REPORTER

I, Sandra K. Bjerke, Registered Professional Reporter and Notary Public for the State of South Carolina at Large, do hereby certify that the foregoing transcript is a true, accurate, and complete record.

I further certify that I am neither related to nor counsel for any party to the cause pending or interested in the events thereof.

Witness my hand, I have hereunto affixed my official seal this 17th day of May, 2018 at Charleston, Charleston County, South Carolina.

_____
Sandra K. Bjerke, RMR, RDR, CRR
My Commission Expires
June 18, 2020

A. WILLIAM ROBERTS, JR. & ASSOCIATES (800) 743-DEPO

154

                              I N D E X

                                                    Page      Line

JOHN J. CHURCH                               3         20

EXAMINATION                                  3         22

BY MR. CARLSON

SIGNATURE OF DEPONENT                       151        1

CERTIFICATE OF REPORTER                     153        1

                  REQUESTED INFORMATION INDEX

                  (No Information Requested)

155

EXHIBITS

|  | Page | Line |
|---|---|---|
| PLF. EXH. B, Notice of | 5 | 18 |
| 30(b)(6) Deposition dated | | |
| 5-3-18 | | |
| PLF. EXH. C, Complaint dated | 14 | 21 |
| 11-11-17 | | |
| PLF. EXH. D, Call Transcripts | 49 | 13 |
| PLF. EXH. E, Collection | 51 | 6 |
| Notices to Mr. Cross dated | | |
| 11-8-16, 12-8-16, 1-9-17, and | | |
| Fed Ex Duplicate Invoice to | | |
| Mr. Cross dated 5-6-16 | | |
| PLF. EXH. F, Uniform Straight | 64 | 6 |
| Bill of Lading Original, Not | | |
| Negotiable, dated 5-6-16, Copy | | |
| of Mr. Cross's Driver's | | |
| License, and Fed Ex Delivery | | |
| Receipt dated 5-6-16 | | |
| PLF. EXH. G, FDCPA Training | 72 | 4 |
| Course and FDCPA Qualification | | |
| Quiz | | |

```
24     PLF. EXH. H, FDCPA Guidelines    77       9

25     PLF. EXH. I, Defendant's         82      15
```

156

Responses to Plaintiff's First
Interrogatories dated 3-28-18
PLF. EXH. J, Collect Screen       90        14
PLF. EXH. K, Account Notes        107       6
dated 11-8-16 through 2-5-17
PLF. EXH. L, Collect Screen,      128       12
Window 2
PLF. EXH. M, MSL Guidelines       139       12
for FXF/FNL, Client 200219
PLF. EXH. N, Online Comments      146       13